Argued and submitted April 20, reversed and remanded July 12, petition for review denied October 4, 2000 (331 Or 193)

In the Matter of
Cassidy Rose Chapman, a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Christina Joleen CHAPMAN,
*Respondent.*

(98-309J; CA A107772)

8 P3d 243

Michael C. Livingston, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Theresa M. Kohlhoff argued the cause and filed the brief for respondent.

Before Kistler, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.

KISTLER, P. J.

### KISTLER, P. J.

The State Office for Services to Children and Families (SCF) appeals from a judgment denying its petition to terminate mother's parental rights to her third child. Relying on ORS 419B.502(4), SCF argues that the evidence that warranted terminating mother's parental rights to her first two children also warrants terminating her rights to her third child. On *de novo* review, we agree and reverse.

ORS 419B.502(4) (1997) authorizes termination of a parent's rights if: (1) the parent's rights to another child have previously been terminated; (2) the conditions that gave rise to that termination have not been ameliorated; and (3) continuing the parental relationship is likely to result in serious abuse or neglect.[1] Given that statutory standard, we begin by summarizing the evidence offered in 1996 to support the termination of mother's first two children. We then set out the events that occurred after the 1996 termination hearing.

Mother's first child was born in 1991. Her second child was born in 1994. Both children were removed from mother's custody in 1994 and termination proceedings were initiated. Because of concerns that mother was suffering from psychological and developmental disabilities, SCF asked a psychologist, Dr. Robert Basham, and a psychiatrist, Dr. Alan Cohn, to examine her. Basham examined mother in 1994. He concluded that she suffered from three conditions: clinical depression, borderline intellectual functioning, and a personality disorder that made her paranoid or distrustful of others. He explained that ordinarily depression could be treated. Mother, however, had been in treatment for more than a year and continued to have significant symptoms of depression. At trial, Basham explained that mother's personality disorder may have made it more difficult to treat her depression effectively. He also testified that mother had paranoid personality traits that made her "prone to be punitive, angry, and quick to attribute malicious intent depending on the misbehavior by the child." Finally, he noted that mother's

---

[1] ORS 419B.502 was amended in 1999. As amended, it no longer requires SCF to prove that continuing the parental relationship is likely to result in serious abuse or neglect. *See* Or Laws 1999, ch 859, § 16.

borderline intellectual functioning made it difficult for her to benefit from therapy intended to overcome her personality disorder or paranoid personality traits.

Cohn examined mother in 1994. His analysis was essentially the same as Basham's. He concluded that mother suffered from depression, had passive, dependent, resistant, and avoidant personality traits, and had probable borderline intellectual functioning. Cohn reported that mother was currently taking 20 milligrams of Trazodone a day, which "is adequate for assisting sleep, but would not affect mood, behavior, or anger at [that] level." He started mother on 20 milligrams of Paxil per day to help her depression and social anxiety.

Mother met with Cohn again in January 1995. Cohn reported that mother was "doing very well on her medication." Mother refused, however, to accept responsibility for her problems. She told Cohn, " 'I have no idea why [SCF took my children]. All I've been told is that it's housing . . . it's really their fault . . . they have no real reason for concern, but they will come up with something . . . they blame it on me being homeless . . . but that's really their fault.' " (Ellipses in original.) According to Cohn, "[mother's] insight was extraordinarily poor, considering the therapy she has had." Cohn stated that it was difficult for him to assess mother's capability to parent because he had seen her only twice but concluded that, in his opinion, "it is not [mother's] cognitive limitations that would interfere with her ability to parent. It is more her lack of insight, poor judgment and her passive-resistance personality traits which cause her to stubbornly resist the suggestions of others."

The evidence of mother's behavior was consistent with Basham's and Cohn's analyses. The evidence showed that mother's anger sometimes hindered her ability to be a good parent. When mother's first child was approximately six to eight months old, he knocked over mother's soft drink on the bed. Mother screamed at him for approximately an hour and a half saying, among other things, that he was just like his father and that she hated him. After that length of time, the child's grandmother began to hear "thumps on the wall" and went into the bedroom to investigate. Grandmother saw

the child trying to crawl past mother on the bed. Grand-
mother testified, "[h]e was trying to get past her and she was
throwing him and he would hit the wall" and bounce back on
the bed. "[S]ometimes he would hit the bed, and he would
bounce from the bed to the wall. * * * [I]t just got worse and
worse." Grandmother attempted to take the child from
mother but was unable to do so. Finally, mother took the
child and left grandmother's house, saying "I can't take this
anymore."[2]

Mother's difficulty controlling her anger continued
after SCF took her first two children into protective custody.
SCF was working with mother as part of a parenting class,
but mother became angry at the caseworker and tried to
leave the building. Shortly afterwards, SCF attempted to
have a meeting with mother, her attorney, and the case-
worker to talk about the class. When the caseworker said
that they needed to talk without one of the children being
present, mother took that child away but did not come back.
When the caseworker went to find her, "this scene happened
with her screaming and, you know, cussing out everybody,
and [she] got very irate very quickly." She said that she
wanted to hit the caseworker. Ultimately, the instructor
asked mother to leave the class because her behavior was too
disruptive. SCF repeatedly offered mother other services but
she either refused or became so angry that the services were
discontinued.[3]

Based on the evidence at the first termination hear-
ing, the trial court agreed with both Basham and Cohn's con-
clusions. It found Basham's statement—that mother "can be
expected to have unreasonable resentments toward others, to
feel angry and rebellious towards anyone trying to exert
influence over her"—"prophetic." The court agreed that this
problem would make it difficult for mother to accept services
designed to make her a better parent. It also accepted

---

[2] On cross-examination, mother's counsel did not question any material por-
tion of grandmother's testimony.

[3] Mother began anger management counseling but stopped because she felt
that the counseling was not working.

Basham's statement that parents with mother's level of intellectual functioning "often have difficulty with parental decision making and are prone to make poor choices and use bad judgment with regards to their children." The court noted that mother's first child was functioning at an extremely low level when the first two children were taken into protective custody. The court found that "when [the first child] was placed in foster care there was dramatic, marked improvement of his level of functioning."[4] Finally, the court noted that there were no existing services that could help mother become a fit parent other than having a surrogate parent be present, which the court concluded was not legally required. Based on those findings, the court terminated mother's parental rights to her first two children on November 19, 1996.

On July 19, 1998, approximately a year and a half later, mother gave birth to her third child. Before that child's birth, mother had four prenatal visits when, according to her doctor, she should have had approximately 12. Her doctor was concerned that mother's "pattern of erratic care will continue after the baby is born." Mother did, however, give birth at a local hospital even though she had told the doctor that she would not do so out of fear that SCF would take the baby away. Right after the baby was born, the nurse gave the baby to mother. Despite being told not to leave the baby alone, mother went out twice that day to smoke cigarettes with friends, leaving the baby unattended. The nurse explained that mother's actions concerned her because, during the first 24 hours, newborn babies have lots of fluids in their stomachs. As the nurse testified, newborns frequently regurgitate but are unable to expel those fluids properly; someone needs to be present to take care of them.

The day after mother's third child was born, a SCF caseworker, who had worked with mother in 1995 and was familiar with her history, visited mother in the hospital. Mother told the SCF caseworker that she was living in a trailer on her mother's property and that she planned to live in that trailer with her new child. Although the trailer did not

---

[1] The second child was born with serious medical problems and was taken into protective custody shortly after his birth.

have electricity or running water, Mother hoped to have both soon. Until she got them, she planned to use the kitchen and bathroom in her mother's adjacent trailer. Neither trailer, however, could be described as sanitary.[5] Mother also told the caseworker that she had not participated in any counseling or parenting classes since her previous involvement with SCF. Based on mother's history, including her past refusal to participate in services, the fact that mother had not participated in counseling or parenting classes since her previous involvement with SCF, mother's living situation, and the reports that mother had left the baby unattended immediately after the baby's birth, the SCF caseworker took mother's third child into protective custody.

SCF did not offer mother services but did offer her a psychological evaluation to determine whether she could benefit from services and, if so, what those services might be. On January 21, 1999, mother met with Dr. David Sweet. During their interview, mother expressed anger at SCF for taking her children but took "absolutely no responsibility for [her first two children] being removed from her care." She complained that she had been "kicked out" of parent training classes. She told him that she was supposed to go to anger management classes but assured him that she had never had a problem with anger. Sweet noted that mother takes one drug to sleep and another for depression, although he also noted that she had not been taking those drugs when she gave birth to her third child. Finally, he observed that mother had gone back to school and was working on a GED, although she had not taken any of her tests yet.

Based on his interview with mother and on tests that he gave her, Sweet diagnosed mother in 1999 with virtually the same problems that Basham and Cohn had diagnosed in 1994: major depression, mild mental retardation,[6] and a personality disorder with characteristics of dependent

---

[5] According to the testimony at trial, there were maggots in the sink in mother's trailer, and her own mother's trailer was "reek[ing] of urine."

[6] Sweet explained that Basham had used the K-Bit test, which he described as a screening test, in diagnosing mother with borderline intellectual functioning and that he used the Wechsler Adult Intelligence Scale, which is a more comprehensive test than the K-Bit, to reach his diagnosis that mother is in the mild range of mental retardation.

and passive-aggressive personality disorders. Sweet testified at the termination hearing that mother's level of intellectual functioning did not, by itself, prevent her from being an adequate parent. Parents functioning at the same level had been successful if they were willing to accept services. Mother, however, was not willing to accept services but instead became angry and hostile when asked about the services she had received. Sweet concluded in his report:

"I believe that there are a combination of problems existent in this woman that have prevented her from caring for her other two children and will prevent her from ever caring for [her third child].

"[Mother] chose not to become involved in any services that would effect significant change in her life. It is clear that she still lacks a clear understanding of why [her first two children] were removed from her care. She continues to choose to blame other people for her problems and will not take responsibility for herself. [Mother] has wasted any opportunities that she could have had to improve her status in life and now she has chosen to have another child that she is not prepared to care for.

"Based on my evaluation and the information available to me, I would recommend that you proceed to petition the court to terminate her parental rights and allow for a more reasonable permanent plan for [mother's third child]. [Mother] has problems of significant severity and duration that she is unlikely to change in a reasonable time and become a resource for [her third child]."

A hearing on SCF's petition to terminate mother's parental rights to her third child was held on August 3, 1999. Following the hearing, the trial court ruled that the state was required to make reasonable efforts to assist mother to enable her to become a minimally adequate parent. Because SCF had not made any efforts after the third child was born, the court ruled that termination of mother's parental rights was not appropriate. When SCF argued that statutorily no services are required when extreme circumstances, such as a previous termination, are present, the trial court found:

"With regard to the termination and the previous termination of the parent's rights, the finding of the Court is that based upon the lapse of time[, t]he difference as well

in the child, who is medically stable as opposed to one of the previous child[ren] who was * * * born premature with medical conditions, the change in mother's attitude in terms of obtaining some prenatal care. Of going to the hospital for the birth despite her perhaps initial reaction of fear and resistance to SCF's involvement. Her taking classes and obtaining more education. Her taking medication and being on medication. The Court finds that there have been conditions such that those[,] and not being with the father of the child as well, those conditions have changed such that * * * the termination of this child * * * [is not] warranted."

The trial court did not reach the question whether termination was in the best interests of the child because the state had not proved extreme circumstances. The trial court accordingly entered a judgment denying the state's petition to terminate mother's parental rights to her third child.

■ On appeal, SCF relies on ORS 419B.502 (1997), the "extreme conduct" statute, to argue that mother's parental rights should have been terminated. That statute provides in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent * * * [is] unfit by reason of a single or recurrent incident of extreme conduct toward the child or another child and that continuing the parent and child relationship is likely to result in serious abuse or neglect. In such case, no efforts need to be made by available social agencies to help the parent adjust the conduct in order to make the return of the child possible. In determining extreme conduct, the court shall consider the following:

"* * * * *

"(4) Previous terminations of the parent's rights to another child if the conditions giving rise to the previous action have not been ameliorated."

ORS 419B.502 (1997). There is no dispute that mother's parental rights to her two oldest children were previously terminated. It follows that the question whether termination is appropriate when SCF relies on ORS 419B.502(4) (1997) turns on three separate but related issues. The first issue is whether there is extreme conduct—whether the conditions

that gave rise to the previous termination have not been ameliorated. ORS 419B.502(4) (1997). If there is extreme conduct, then the second issue is whether continuing the parent and child relationship is likely to result in serious abuse or neglect. ORS 419B.502 (1997). The final issue is whether termination is in the best interests of the child. ORS 419B.500.

■ Under ORS 419.502(4) (1997), an earlier termination will constitute extreme conduct "if the conditions giving rise to the previous [termination] have not been ameliorated." In this case, the conditions that gave rise to the previous termination of mother's parental rights to her two oldest children were depression, borderline intellectual functioning, and a personality disorder that caused mother to be distrustful of others. Sweet's diagnosis makes clear that the same three conditions that gave rise to the termination of mother's first two children in 1996 continue unabated.

■ The trial court reached a different conclusion. It noted that mother had taken a number of small steps, such as enrolling in classes to obtain a GED, to begin to improve her life. There is no evidence, however, that mother has carried through with any of those initial steps in a way that would call Sweet's diagnosis into question. We credit Sweet's conclusion that the underlying psychological conditions and developmental disabilities that gave rise to the termination of mother's first two children persist. Indeed, the trial court found that "at the present time [mother] is not in a position to parent."[7] SCF has proven extreme conduct—that the conditions that gave rise to the previous termination have not been ameliorated—by clear and convincing evidence. *See* ORS 419B.502(4).

■ The next issue is whether SCF has proved by clear and convincing evidence that "continuing the parent and

---

[7] The trial court's decision not to terminate mother's parental rights to her third child appears to have been based primarily on the fact that SCF did not offer mother services, other than a psychological evaluation, before petitioning to terminate mother's parental rights. However, where a parent's rights to another child have been previously terminated, and the conditions giving rise to the previous action have not been ameliorated, "no efforts need to be made by available social agencies to help the parent adjust the conduct in order to make the return of the child possible" if continuing the parent and child relationship is likely to result in serious abuse or neglect. ORS 419B.502(4).

child relationship is likely to result in serious abuse or neglect." ORS 419B.502 (1997). When SCF relies on ORS 419B.502(4) (1997) as the basis for terminating a parent's rights, evidence offered to prove extreme conduct may also suffice to establish the likelihood of serious abuse or neglect. This case illustrates that proposition. Because the psychological and developmental conditions that gave rise to mother's anger towards her first child have not been ameliorated, we find that continuing the parental relationship is likely to result in serious abuse or neglect of mother's third child.

Finally, we conclude that it is in the best interests of this child to terminate mother's parental rights. Not only would continuing the parental relationship expose this child to abuse and neglect, but the substantial gains in functioning that mother's first child made when removed from her care also persuade us that termination is in this child's best interests as well. *See* ORS 419B.500; *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 189, 796 P2d 1193 (1990) (children have right to grow up without fear of abuse or neglect; where a parent has been unable or unwilling to rehabilitate himself or herself within a reasonable time it is generally in the best interests of the child to terminate that parent's parental rights). SCF has proved by clear and convincing evidence that mother's parental rights to her third child should be terminated under ORS 419B.502(4) (1997).[8]

Reversed and remanded with instructions to enter an order terminating mother's parental rights.

---

[8] We do not reach either SCF's argument that termination is warranted under ORS 419B.504 or its second assignment of error.