Argued and submitted March 17, reversed May 10, 2006

In the Matter of Jason Schoonover, Jr.,
aka Jason Micheal Schoonover, Jr.,
aka Jason Michael Schoonover, Jr.,
and Taylor Keeton,
aka Taylor Ward Keeton-Salvi,
Minor Children.

STATE ex rel DEPARTMENT OF
HUMAN SERVICES,
*Respondent,*

*v.*

Sandra Elaine KEETON,
*Appellant.*

0400014JV1, 0400014JV2; A129628

135 P3d 378

James J. Spindor argued the cause and filed the brief for appellant.

Stacey RJ Guise, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum,* Judges.

HASELTON, P. J.

---

* Rosenblum, J., *vice* Schuman, J.

## HASELTON, P. J.

Mother appeals a judgment terminating her parental rights to her two sons, J and T, on the grounds that mother is an unfit parent under ORS 419B.502 by reason of extreme conduct, that mother is unfit by reasons of conduct or condition seriously detrimental to the children and that integration of the children into mother's home is improbable within a reasonable period of time, ORS 419B.504, and that mother failed or neglected to provide for the basic physical and psychological needs of the children for the six months prior to the filing of the petition, ORS 419B.506. On *de novo* review, ORS 419A.200(6)(b), we conclude that (1) the court erred in determining that, pursuant to ORS 419B.504, integration of the children into mother's home was improbable within a reasonable time due to conduct or conditions not likely to change; (2) the state's concession that ORS 419B.506 does not support termination is well-founded; and (3) the state failed to prove by clear and convincing evidence that termination was in the best interests of the children, ORS 419B.500. Accordingly, we reverse the termination of mother's parental rights.

J was born in 1996. At that time, mother was living with J's father, Jason Schoonover, in the home of Schoonover's parents, the Salvis. Schoonover's younger sibling, Emmitt Tribble, also lived in the home. In approximately 1998, mother, who was then around 26 years of age, began engaging in sexual activity with Tribble, who was then around 14 years of age. Both mother and Tribble have significant developmental delays. As a result of that sexual contact, mother gave birth to T in 1999, when Tribble was 15 years old. Shortly after T's birth, mother and Tribble ceased having sexual contact. Mother continued to live in the home of the Salvis, who were aware that T had been fathered by Tribble.

In 2002 and again in 2003, Tribble sexually abused children and, as a result, was convicted of various crimes and placed on probation. In late 2003, DHS received a report that mother's children were residing in the same house as Tribble and became concerned, due to his history of sexual offenses.

A DHS worker visited the home and the children's school and was satisfied that mother was not allowing contact between the children and Tribble. Shortly thereafter, however, in January 2004, DHS learned that mother's younger child, T, was the product of a sexual relationship between mother and Tribble. When confronted with that information, mother acknowledged T's paternity and indicated that Tribble had been in the eighth grade when she engaged in sexual activity with him. At that point, DHS removed both children from the home. J and T were placed together in foster care,[1] and, on March 31, 2004, were found to be within the jurisdiction of the juvenile court. The children were well nourished and well cared for when they entered foster care. At around that time, mother moved out of the Salvi home and into a home with her fiancé, Hansen.

DHS presented mother with a letter of expectation and a service agreement in March 2004 that required mother to participate in weekly supervised visitation with the children, attend parenting classes, and participate in a psychosexual evaluation. Mother participated in visitation regularly and was perceived by DHS workers, as well as the children's foster mother, as engaging in appropriate parenting and as having an extremely strong bond with both children, both of whom want to return to their mother's care. By all reports, mother cooperated fully with DHS.

Mother began parenting classes at Lutheran Community Services in April 2004 and completed the program in September 2004. She attended all classes, showed a positive attitude, completed all homework, and made significant progress in her parenting skills.

In May and June 2004, mother's psychosexual evaluation was conducted at the Center for Behavioral Intervention. The Center's director, Steven Jensen, prepared a report that stated that mother has borderline intellectual functioning, had been a special education student, and has virtually

---

[1] J was originally placed with Schoonover, who had previously moved out of the home and married, but Schoonover returned J to DHS several days later because he feared that J would engage in sexual abuse of Schoonover's other young children.

no employment history. Jensen noted that mother is immature and socially unsophisticated and, due to her developmental delays, may have perceived Tribble more as a peer than as a child. He concluded that mother did not fully comprehend issues related to consent or sexual exploitation of children, that she believed that children were capable of seeking out sexual relationships with adults, and that she believed that Tribble had been old enough to decide to have sex.

Although mother reported to Jensen that she had been sexually abused as a child and had not liked the experience, Jensen noted that mother also failed to understand how her sexual abuse of Tribble might have had some connection to the fact that Tribble later went on to sexually abuse others. Jensen reported that mother had passed a polygraph examination indicating that she had had no sexual contact with minors other than Tribble, and further noted that mother lacked a history of criminal, sexually compulsive, or predatory behavior. Based on his assessment, Jensen concluded that mother was at low risk to reoffend. Nevertheless, he was concerned that mother "does not seem to understand why what she did is wrong and may not have adequate controls to avoid engaging in the behavior at a later date." Consequently, Jensen recommended that, before any decision was made as to whether the children should be returned to mother, she be required to participate in a sex offender treatment program designed for individuals of limited intelligence.

In August 2004, mother and DHS entered into a new service agreement that required mother to participate in a modified outpatient treatment program for sex offenders with limited intellectual skills. That agreement further provided that DHS would make the necessary referrals for new services. Mother's caseworker identified a potential provider of outpatient treatment for mother, Wright, but had not yet requested special funding to pay for that treatment as of October 2004, when the caseworker ceased working with mother.

In late September 2004, DHS changed its plan for the children from reintegration into mother's home to termination.[2] Mother's attorney requested that DHS continue to provide services to mother.[3] In November 2004, a permanency hearing was held, and DHS filed the present petition to terminate mother's parental rights.

In December 2004, mother was indicted on numerous felony charges alleging that she had committed various sexual offenses against Tribble between September 1997 and November 1999.

In January 2005, DHS requested funding for mother's outpatient treatment, but that request was not approved until June 2005. Following that approval, Wright indicated that she would not be able to begin mother's treatment until late summer. In early July 2005, mother was arrested based on the charges relating to her sexual abuse of Tribble. Mother remained in custody on those charges at the time of the termination trial on July 20 and 21, 2005.

At the termination trial, the state presented evidence from Jensen, who had conducted mother's psychosexual evaluation. Jensen reiterated the findings from his evaluation and elaborated on those findings somewhat:

> "[Mother is] at some risk now, as we indicated in our report. I feel she's a low risk right now. If she were to receive sole custody of her children, the risk would increase as they reach adolescence, and particularly when they have adolescent friends in, the risk would increase again."

Jensen further rendered the opinion that, if the children were returned to mother, she should be monitored frequently, including by polygraph, until the children reached the age of 16. He added that mother should begin sex offender treatment before the children were returned to her, but he

---

[2] The record does not disclose why DHS changed the plan at that point.

[3] The state asserts on appeal that the delay in providing outpatient treatment to mother was based, at least in part, on her attorney failing to agree that she should receive the services. Clear and convincing evidence does not support the state's assertion. Rather, on *de novo* review, we find that mother's attorney agreed in a timely fashion that she should receive the outpatient treatment recommended by DHS, and the delay was due to DHS's failure to obtain funding for the services.

did not believe that she necessarily would have to complete that treatment before the children were returned. In Jensen's opinion, without treatment, mother posed a danger to her children.

The state also presented evidence that the children were doing well in foster care, although both had attention deficit problems and presented other challenges. J was doing well in school and was described as very intelligent. He was receiving counseling to address sexually reactive behavior. T was receiving special education services and had attended kindergarten with a full-time aide.

The children's foster mother testified that the children were well bonded with each other and with mother. The foster mother believed that the children had not experienced neglect or abuse in mother's care, that mother demonstrated appropriate parenting skills, and that it would be in the children's best interest to be returned to mother. The foster mother further stated that she was not a potential adoptive resource for the children. At the time of trial, DHS had not identified any adoptive resource for the children, although a DHS caseworker indicated that a search for an adoptive placement was underway.

As noted, the trial court terminated mother's parental rights based on ORS 419B.502, ORS 419B.504, and ORS 419B.506.[4] The trial court made the following findings:

"2. The mother is unfit by reason of the following extreme conduct:

"a)  Rape, sodomy or sex abuse of a child by the parent.

"3.  The mother is unfit by reason of conduct or condition seriously detrimental to the children and integration of the children into the mother's home is improbable within a reasonable time due to conduct or conditions not likely to change, including the following:

"a)  Criminal conduct that impairs the parent's ability to provide adequate care for the children.

---

[4] Both fathers' parental rights also were terminated. Those dispositions are not at issue on appeal.

"b)   Lack of effort or failure to obtain and maintain a suitable or stable living situation for the children so that return of the children to the parent is possible.

"c)   Failure to present a viable plan for the return of the children to the parent's care and custody.

"d)   Failure to learn or assume parenting and housekeeping skills sufficient to provide for the safe and proper raising of the children.

"e)   Mental, emotional, or psychological abuse of the children.

"f)   An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.

"g)   Conduct toward a child, of a cruel, abusive, or sexual nature.

"h)   Physical and emotional neglect of the children.

"i)   Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the children to the parent possible.

"j)   Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"4.   The mother has failed and neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the children for six months prior to the filing of the petition as shown by her:

"a)   Failure to implement a plan designed to lead to the integration of the children into the mother's home.

"5.   It is in the children's best interest that the mother's parental rights be terminated and that the children be freed for adoption."

On appeal, mother contends that the trial court's findings in support of termination are not supported by clear and convincing evidence in the record. The state concedes that evidence in the record does not establish neglect as a basis for termination pursuant to ORS 419B.506. We accept that concession as well-founded. *See State ex rel Dept. of*

*Human Services v. Squiers*, 203 Or App 774, 126 P3d 758 (2006). Accordingly, the remaining issues are whether clear and convincing evidence supports the trial court's findings of unfitness under ORS 419B.502 and ORS 419B.504, and its finding pursuant to ORS 419B.500 that termination of mother's parental rights is in the best interests of the children.

We turn first to the question whether the trial court erred in terminating mother's parental rights based on ORS 419B.504. In *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001), the court described the inquiry under ORS 419B.504 as follows:

"ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' That second part of the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.' "

We note at the outset that the state makes little or no effort to justify a number of the trial court's findings regarding ORS 419B.504 (findings 3a to 3j), which are contained in the veritable laundry list quoted above.[5] *See* 205 Or App at 576-77. For example, the record is devoid of evidence that mother failed to maintain a suitable living situation for the children (finding 3b); that she failed to provide a viable plan for the return of the children to her care (finding 3c);

---

[5] The court's findings were, essentially, a cut-and-paste replication of the language of ORS 419B.504(1) through (6).

that she failed to learn parenting and housekeeping skills (finding 3d);[6] or that she mentally, emotionally, or psychologically abused or neglected the children (findings 3e and 3h). Rather, the evidence showed that mother successfully completed parenting classes and had adequate parenting skills, that the children never experienced neglect or abuse while in her care, and that she lived with her fiancé and that they planned to marry and raise the children together.

Further, the state presented no evidence that mother suffered from any mental or emotional illness (finding 3f). Although there was evidence that mother's borderline intellectual functioning would require that sex offender treatment be tailored toward her level of functioning, that does not constitute clear and convincing evidence that mother has a "mental deficiency of such nature and duration as to render [her] incapable of providing care" for the children. *See generally State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 78 n 14, 106 P3d 627 (2005) (rejecting argument that evidence of the mother's low intellectual functioning supported a finding that she had a mental deficiency that was seriously detrimental to the child).[7]

■ With respect to "criminal conduct" (finding 3a), the state points to the fact that mother had been incarcerated for several weeks at the time of the termination hearing, awaiting trial on criminal charges concerning her sexual contacts with Tribble. However, the Oregon Supreme Court has made it clear that incarceration is not, *per se*, a ground for termination. *See Stillman*, 333 Or at 147.

In *Stillman*, the father was incarcerated as a result of a criminal conviction at the time of the termination trial, would remain incarcerated for another four months, and would not be in a position to have the children returned to

---

[6] There is no indication in the record that mother's housekeeping skills had ever been at issue in this case.

[7] It does not appear that any psychological examination of mother was ever conducted. Thus, there is no diagnosis in this record to support a conclusion that mother suffered from any mental or emotional illness. Jensen, who conducted mother's psychosexual evaluation, testified that he was not able to provide any such diagnosis because he was not a psychologist.

him for as long as a year. *Id.* at 149. Nevertheless, the court concluded that incarceration for a crime did not necessarily constitute "criminal conduct that impairs the parent's ability to provide adequate care for the child" under ORS 419B.504(6). *Id.* at 147. In so holding, the court cautioned that

> "incarceration, and its consequences for the children, [is not] outside the purview of the court. A parent's imprisonment for a criminal act, is, in any event, a 'condition' of the kind that the court is entitled to consider under the wording of the first part of ORS 419B.504. It cannot be disputed reasonably that any prolonged incarceration could be a condition so 'seriously detrimental to the child' as to warrant a finding of unfitness."

333 Or at 147-48 (footnote omitted). The court went on to conclude that the father's condition of incarceration "would be sufficient to warrant a finding of *unfitness*, notwithstanding the relatively short period that it was likely to continue," *id.* at 149 (emphasis in original), but that the children's anxiety about their father's incarceration did not establish "the sort of serious detriment that the legislature contemplated as providing the basis for a conclusion that a parent is unfit." *Id.* at 152.

■ In this case, there is even less reason than in *Stillman* to conclude that mother's incarceration constituted a basis for termination under ORS 419B.504. Here, mother had been incarcerated pretrial on criminal charges for several weeks before the termination trial. Obviously, in the absence of a criminal conviction, *pretrial* incarceration on criminal charges is not "imprisonment for a criminal act." *Stillman*, 333 Or at 147. Moreover, any judicial prediction by the juvenile court concerning the likelihood of a parent's conviction, much less the length of a consequent sentence, would be improper. Finally, the state presented no evidence that the children were even aware of mother's pretrial incarceration, much less that it caused them any serious detriment. Thus, we reject the state's suggestion that mother's short pretrial incarceration, without more, supports the court's findings concerning "criminal conduct" or "condition seriously detrimental to" the children. ORS 419B.504.

We further determine that the record lacks clear and convincing evidence to support the trial court's findings (findings 3i and 3j) that mother demonstrated a "lack of effort to adjust [her] circumstances, conduct or condition to make return of the children possible," or that mother failed "to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." Mother met all of DHS's expectations as set out in her service agreements prior to August 2004. In August 2004, a new service agreement required mother to participate in outpatient sex offender treatment, but it also required DHS to make the necessary referral for that service. DHS did not even request funding for such services until long after it had decided to proceed with termination, in September 2004, and did not authorize funding for that service until approximately a month before the termination trial was held in July 2005. Even then, the approved provider, Wright, was not going to be available until late summer 2005, after the termination trial.

In sum, the requirement that mother receive treatment was imposed in a service agreement entered into in August 2004, but DHS proceeded with termination several months later without first making any efforts at all, much less "reasonable efforts," to provide mother with the required treatment.[8] Given those circumstances, the "lack of effort," "reasonable efforts," and "extended duration" components of the juvenile court's findings are not supported by clear and convincing evidence.

We turn, finally, to the remaining components of the findings under ORS 419B.504—"[c]riminal conduct that impairs the parent's ability to provide adequate care for the children" and "[c]onduct toward a child, of a * * * sexual nature" (findings 3a, 3g). As noted, the mere pendency of charges or pretrial incarceration on those charges does not, and cannot, by itself, establish "criminal conduct." *See* 205 Or

---

[8] This is not a case in which DHS was relieved of its obligation to make reasonable efforts to make it possible for the child to safely return home. *See* ORS 419B.340. In particular, the juvenile court made no finding, pursuant to ORS 419B.340(5)(a), that, because of "aggravated circumstances," DHS was excused from making the otherwise requisite reasonable efforts.

App at 579-80. However, in this case, there was uncontroverted clear and convincing evidence that mother had, in fact, engaged in sexual conduct with Tribble when Tribble was a child. That conduct was criminal, and was conduct toward a child of a sexual nature. Thus, there is clear and convincing evidence to satisfy the first part of the *Stillman* test—*viz.*, that a "conduct or condition" is present.

■     We proceed to the next inquiry under ORS 419B.504, *viz.*, whether that conduct is "seriously detrimental" to the children, thus rendering mother "unfit." The court emphasized in *Stillman* that unfitness is measured as of the time of the termination hearing. *Stillman*, 333 Or at 149. Here, mother's sexual abuse of Tribble ceased shortly after T's birth—more than five years before the termination hearing. Mother's polygraph administered as part of her psychosexual evaluation indicated that she had had no sexual contact with any other minor. Finally, there was no evidence, much less clear and convincing evidence, that either of the children had suffered any actual adverse consequences as a result of mother's sexual contact with Tribble.

Thus, to the extent that we limit our analysis to mother's past sexual conduct with Tribble, evidence of serious detriment to the children from that *conduct* is lacking. However, it is clear that, in assessing past criminal or sexual conduct and its detriment to children, we must also consider the "sequellae" of that conduct. *Stillman*, 333 Or at 147. In *Stillman*, for example, the father's criminal "conduct" led to the "condition" of incarceration, and the court assessed the detriment to the children from that condition. 333 Or at 149-50. In this case, mother's conduct resulted in her need for sex offender treatment. Consequently, our inquiry shifts to whether mother's "condition" as an untreated sex offender at the time of the termination trial was seriously detrimental to the children.

We have no doubt that, as an abstract proposition, a parent's condition as an untreated sex offender can be, and generally is, a condition that is seriously detrimental to that parent's children. Here, the likelihood of such present serious

detriment to T and J, even if mother's condition is not immediately treated, is, perhaps, less pronounced than in the generality of cases. In that regard, we note the content of Jensen's assessment, including his opinion that mother is at a "low risk" to reoffend, the fact that mother, without treatment, has not reoffended since 1999, the circumstances of mother's prior conduct (*viz.*, that that conduct, exclusively with Tribble, occurred when Tribble was an adolescent), and the fact that T and J are a few years away from adolescence.

■ In all events, even assuming, without deciding, that mother's present, untreated, condition is seriously detrimental to the children, termination pursuant to ORS 419B.504 is unwarranted because the state has failed to prove that integration of the children into the parent's home "is improbable within a reasonable time due to conduct or conditions not likely to change."

Here, the state has not established by clear and convincing evidence that mother's condition as an untreated sex offender was "not likely to change." To the contrary, the record shows that mother was committed to cooperating with a sex offender treatment program and that DHS was obligated pursuant to mother's service agreement to refer mother to such a program, but that DHS did not follow through with that referral in a timely manner, as described in detail above. *See* 205 Or App at 573-75. Given Jensen's opinion that the children might be returned to mother after she entered treatment but before she completed it, the state has established neither that mother's condition is "not likely to change" nor that integration of the children into mother's home was "improbable within a reasonable time." Consequently, the trial court erred in terminating mother's parental rights pursuant to ORS 419B.504.

We consider, finally, whether termination was warranted under ORS 419B.502. That statute provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of a single or recurrent incident of extreme conduct toward any child. In such case, no efforts need to be made by available social agencies to

help the parent adjust the conduct in order to make it possible for the child or ward to safely return home within a reasonable amount of time. In determining extreme conduct, the court shall consider the following:

"(1) Rape, sodomy or sex abuse of *any* child by the parent."

(Emphasis added.) By its terms, that statute is not limited to circumstances in which the parent has abused his or her own child. Rather, the statute applies if the parent has sexually abused any child. As with termination of parental rights based on ORS 419B.504 or ORS 419B.506, even if the requisites of ORS 419B.502 are satisfied, the court must then determine whether termination is in the best interest of the children. ORS 419B.500; *State ex rel Juv. Dept. v. Beasley*, 314 Or 444, 452, 840 P2d 78 (1992).

We have not yet had occasion to interpret the present version of ORS 419B.502. In *State ex rel SOSCF v. Chapman*, 169 Or App 168, 8 P3d 243, *rev den*, 331 Or 193 (2000), we interpreted a prior version that permitted termination if the court found that the parent was "unfit by reason of a single or recurrent incident of extreme conduct toward the child or another child *and that continuing the parent and child relationship is likely to result in serious abuse or neglect.*" *Id.* at 176, *quoting* ORS 419B.502 (1997) (emphasis added). However, the emphasized language was removed from the statute in 1999. *See* Or Laws 1999, ch 859, § 16.

In this case, mother argues that, even if there is clear and convincing evidence of "extreme conduct," *i.e.*, evidence of the "rape, sodomy or sex abuse of any child," that does not automatically and necessarily render the parent unfit. Rather, noting that ORS 419B.502 requires a finding of unfitness *"by reason of"* the extreme conduct, mother asserts that the statute requires a court, after finding extreme conduct, to then determine whether the extreme conduct materially impairs the parent's ability to act as a parent at the time of the trial. Indeed, mother contends that to construe the statute otherwise, without any requirement of a nexus between the extreme conduct and detriment to the child, would, effectively, mean that any person who, at any age,

engaged in "extreme conduct," would be forever precluded from being a parent.[9]

The state responds that the current version of the statute does not require any proof of a nexus between the extreme conduct and the parent's current ability to parent—*viz.*, that any of the types of extreme conduct listed in the statute, by themselves, constitute unfitness as a matter of law. The state posits that, if mother's interpretation were correct, then ORS 419B.502 and ORS 419B.504 would, essentially, be the same, in that both would require a showing that the parent's conduct was "seriously detrimental to the child." The state argues that such an interpretation would violate the maxim on statutory construction that the court should attempt to give effect to all statutory provisions. ORS 174.010.

We note that, to read the statute in the manner the state suggests, would, in essence, eliminate any requirement for a finding of present unfitness—that is, that unfitness and extreme conduct would be conflated notwithstanding the "by reason of" language of ORS 419B.502. On the other hand, to read the statute as mother does—to require the state to establish by clear and convincing evidence a nexus between a parent's extreme conduct and serious detriment to the children—would render ORS 419B.502 redundant of some aspects of ORS 419B.504.

Having raised that question of statutory construction, however, we need not resolve it here. Regardless of the correct construction of ORS 419B.502, even if a court determines that the requisites of that statute are met, the court must then make a determination that termination of parental rights is in the best interests of the children. *See* ORS 419B.500. Here, even assuming without deciding that the requisites of ORS 419B.502 were satisfied, we conclude that

---

[9] By way of illustration, mother posits the hypothetical of an 18-year-old who is convicted of third-degree sexual abuse, ORS 163.415, for having "groped" someone under the age of 18 at a teenage drinking party, and who later has a crime-free and successful life and, at age 40, becomes a parent. Unless ORS 419B.502 incorporates a "nexus" requirement, mother asserts, that person's parental rights could be terminated for "extreme conduct" that occurred, under very different circumstances, more than 20 years earlier.

the state has not established, by clear and convincing evidence, that termination of mother's parental rights would be in the children's best interests.

We acknowledge, at the outset, that mother needs to receive sex offender treatment and, if she does not successfully participate in such treatment, she could pose a risk to children—her own and others—in the future. Although mother's current risk of reoffending, as assessed by Jensen, is low, it is not insignificant. Moreover, at the time of trial in July 2005, mother was not in a position to have the children returned to her immediately. That is—putting aside speculation about the pending criminal charges—mother needed to at least begin sex offender treatment *before* the children could be returned to her care.

At the same time, many other factors in this case strongly militate against termination. First, as noted above, there is no evidence that the children have ever experienced abuse or neglect, by mother or by anyone else. Second, the record leaves no doubt at all that both children are strongly bonded with mother and very much want to return to her care. Their foster mother testified that mother's visits with the children went very well, but that the children were consistently sad after she left, did not understand why they could not be with their mother, and wanted to know when they were going to be able to go back home to their mother. The foster mother believes that it is in the children's best interests to return to their mother. Third, mother has cooperated fully with DHS and is committed to participating in the treatment that constitutes the sole barrier to returning the children to her. *Cf. State ex rel Juv. Dept. v. Geist,* 310 Or 176, 189, 796 P2d 1193 (1990) ("Children have a right to grow up in a wholesome and healthful environment, free from fear of abuse, injury, or neglect. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time so as to provide such an environment, the best interests of the child(ren) generally will require termination of that parent's parental rights."). Finally, it is noteworthy that, at the time of the termination trial, DHS had not identified any adoptive resource for these children, so the state's urging that termination is required because the children

"have a strong need for immediate stability and permanency" rings hollow.[10]

■    In sum, at the time of the termination trial, mother was prepared to begin sex offender treatment; the service provider that DHS had finally designated to provide the service was prepared to begin the treatment; and that treatment was the only barrier to returning the children, who were strongly bonded with mother. Such a combination of "best interests" considerations militating against termination is not merely unusual, but unique in our experience.

For all of the reasons stated above, we conclude that the trial court erred in terminating mother's parental rights.

Reversed.

---

[10] We note that, although ORS 419B.470(2) requires a permanency hearing within 14 months of the children coming into foster care or 12 months after the children are found to be within the jurisdiction of the court, whichever is first, those time lines did not dictate the haste with which DHS acted in this case. Under the circumstances presented here, a permanency hearing needed to be held by early March 2005. DHS, however, made the decision to proceed to termination less than six months after the children had been found to be within the jurisdiction of the court. In this case, as in *State ex rel Dept. of Human Services v. Huston*, 203 Or App 640, 660, 126 P3d 710 (2006) (Brewer, C. J., concurring), "the agency should have taken more of that time to give mother a chance to succeed or fail in the * * * treatment that its own expert recommended."