168 P.3d 322 (2007)
215 Or. App. 83
In the Matter of S.-A.R.W., a Minor Child.
STATE ex rel. DEPARTMENT OF HUMAN SERVICES, Respondent,
v.
R.O.W. and N.S.-W., Appellants.
0400510; A134799.
Court of Appeals of Oregon.
Argued and Submitted July 2, 2007.
Decided September 19, 2007.
*324 James J. Spindor, Klamath Falls, argued the cause and filed the brief for appellant N.S.-W.
Daphne E. Mantis, Eugene, argued the cause and filed the briefs for appellant R.O.W.
Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before HASELTON, Presiding Judge, and ARMSTRONG and ROSENBLUM, Judges.
ROSENBLUM, J.
Mother and father appeal a judgment terminating their parental rights to their child, S. They argue that the state failed to prove by clear and convincing evidence that they were unfit to parent at the time of the termination proceeding. Mother also contends that DHS did not make reasonable efforts to reunify the family. We review de novo, ORS 419A.200, and conclude that the state presented clear and convincing evidence that mother is unfit to parent by reason of her mental defect. We also conclude that clear and convincing evidence demonstrates that father is unable to protect S from the dangers she faces in mother's care and that, despite the state's reasonable efforts, he has failed to make a lasting adjustment to that condition. Although parents presented a plan on the day of the termination trial that mother and S will be supervised by relatives, that plan will not ensure that S is never left alone with mother. Thus, integration of the child into parents' home is unlikely within a reasonable amount of time. We also conclude that termination is in S's best interests. Accordingly, we affirm the judgment of the trial court.
We take the facts from the evidence presented at the termination hearing. In August 2004, a few weeks before the birth of S, the Department of Human Services (DHS) received a report from an unnamed source that mother was pregnant and that both she and father lacked the cognitive abilities to care for a newborn infant. When caseworker Susan Brugato arrived at parents' home to investigate the report, she had difficulty finding the front door because the yard was so cluttered with debris. She eventually found a path to the door near a small dog pen containing "lots of feces, and urine, and no dog food or water." The dog inside the pen was "very thin and skinny," and its food and water bowls were covered with cobwebs.[1] When she entered the home, Brugato was "immediately able to tell [that the home] was not within community standards for the health and safety of a child" because it was so dirty and cluttered that Brugato could not see any windows or furniture, let alone walk through the house.
Brugato identified herself and told mother about the report. During their conversation, it became clear that mother was "very low functioning" and that Brugato would need to speak with father. Brugato left mother her card and asked her to have father call when he arrived home from work. When father called later that day, Brugato explained that the home was not safe for an infant and expressed concern about mother's ability to parent. Although father acknowledged the dismal condition of the home and told Brugato that they were planning to move, he "was not concerned" about the potential effect of mother's cognitive limitations on her ability to care for an infant and "didn't see an issue with having [mother] alone with a brand new baby." Brugato informed father that DHS would hold a team decision meeting to discuss whether mother could care for an infant, and she encouraged him to invite family members to that meeting. Father told Brugato that he would invite his mother and his grandmother.
*325 The first team decision meeting was held the next day. None of father's or mother's family members attended. At that meeting, Brugato again explained to father why she was concerned about mother's ability to care for the couple's child, and father again insisted that he "did not see any issues with [mother] being alone with [S] all day long." Brugato asked mother and father to formulate a safety plan to ensure that someone would be available to assist mother on a full-time basis. Father agreed to call his grandmother to ask whether parents could live with her for an undetermined time as part of their agreement that they would find stable and adequate housing.[2] Father also told Brugato that his father and a parenting coach, Lorae Viars, would supervise mother. When Brugato contacted father's father and Viars, they both told her that they were unable to assist mother full time.
A second team decision meeting was held soon after the first because no one from parents' families had attended the first meeting. Although Viars and father's father both attended that second meeting, father's mother and grandmother again did not. Despite their earlier acknowledgment of the need to find suitable housing in advance of their child's birth, parents had failed to formulate a safe childcare plan, and father continued to deny that mother needed assistance to care for the child. Brugato informed father that, unless mother and the baby moved to a maternity home where mother could learn the skills necessary to care for a newborn infant, DHS would place S in foster care to ensure her safety.
When S was born in August 2004, DHS filed a dependency petition. The petition alleged that mother's developmental disabilities impair her ability to safely parent the child, that father's ability to safely parent the child was unknown but that he had mental health issues that affected his ability to parent, that the home was unsafe for a child, and that parents had failed to develop a plan to ensure the child's safety after her birth. The juvenile court granted DHS temporary custody of S, and father entered into a service agreement that included a substance abuse evaluation and a psychological evaluation.[3]
Psychologist Dr. David Sweet evaluated mother and diagnosed her with mild mental retardation, estimating that her cognitive capabilities are those of less than a 10- or 12-year-old child. Sweet also diagnosed mother with a dependent personality disorder. As a result of those conditions, she is "extremely dependent on other people" and "can't manage things adequately on her [own] on a daily basis. She needs people to be there [to] take care of her." Sweet recommended that mother and father enroll in one-on-one parenting training and noted that, "[a]t some point, if she is able to acquire adequate skills, she may become an adequate parent."
After mother left the hospital with S, they moved into the Safe Haven Maternity Home. Over the next month, several social service providers worked with mother in an attempt to help her learn how to care for S. Despite the efforts of the staff, mother was unable to learn to care for the child. For instance, Safe Haven house mother Barbara Hastings attempted to teach mother how to bathe S, yet mother was unable to keep S safe during bath time. Hastings had to frequently remind mother not to let go of S in the bath, and she once had to physically intervene so the child "wouldn't slide into the water." Family resource worker Karen Gould similarly was unable to teach mother how to nurture, bathe, and feed S, and community health nurse Wendy Zyzniewski unsuccessfully attempted to train mother to recognize and respond to S's cues. Because mother was unable to learn the skills necessary to safely care for an infant, Hastings, Zyzniewski, and Gould agreed that mother needs constant supervision to avoid placing S's life and health in danger.
*326 Mother's cognitive deficiencies also affected her ability to bond with S. According to Brugato, mother never made eye contact with the baby and referred to her daughter as "`it,' almost as if the baby wasn't a human being." Zyzniewski testified by deposition that mother was unable to adequately bond with S and "would hand the baby off to anybody who would take her and want to go do whatever she wanted to do." Gould was similarly concerned with mother's interactions with S because "[t]here was no conversation, just a flat affect, * * * lack of nurturing." Moreover, mother's inability to bond and to understand how to communicate with S caused her to become easily frustrated. Her typical response to S crying was to scream at the infant to "shut up," despite Hastings's repeated explanations as to why that response was inappropriate.
Approximately one month after mother and S arrived at Safe Haven, mother's roommate heard mother screaming at S and found mother holding the baby as if she had been shaking her. When Hastings asked mother about her roommate's allegations, mother admitted to shaking S. Hastings explained why babies must not be shaken and that she was required to report the incident to DHS. When Brugato investigated Hastings's report, mother told her that she "doesn't shake the baby a lot."[4] Although mother initially denied shaking S to DHS intake worker Sandra Webster, mother later shook a teddy bear to show Webster what she had done to S, and said that she did not like to shake the baby.
Based on the shaking incident, DHS removed S from mother's care. Father vehemently disagreed with the decision to remove S from mother's care and continued to make excuses for mother. While Brugato would expect any parent to be angry at the decision to remove their child, she was afraid that father's significant minimization of mother's cognitive condition and its effect on her ability to care for S would place S in mortal danger if she were returned to parents' care.
Dr. James Ewell, who evaluated father shortly before S was removed, agreed that father's apparently intractable belief that mother could safely and adequately parent S placed the child in danger. In addition to his inability to recognize mother's limitations, Ewell opined that father's own psychological conditions rendered him incapable of offering the level of consistent parenting or providing the structure required to raise a child. Ewell diagnosed father with alcohol dependence in partial remission based on father's admission that he is addicted to alcohol and does not abstain from drinking. Ewell explained that father's alcohol consumption could interfere with his judgment, his ability to maintain employment, and his ability to maintain appropriate relationships, creating an environment that could impede a child's development. Father was also diagnosed with attention deficit hyperactivity disorder (ADHD), further exacerbating his difficulty maintaining employment and appropriate long-term housing and interfering with his judgment as a parent and ability to provide for S.
Although father's alcoholism and ADHD are both treatable conditions, he also suffers from a personality disorder that is resistant to treatment as a result of avoidant, paranoid, and passive-aggressive features. His personality disorder results in, among other things, a tendency to resist cooperating or following through with authority figures by using passive-aggressive obstructionism, and unusually negative feelings, particularly toward people in positions of authority. These features of father's personality disorder create an environment that is unpredictable and unstable and that would undermine a child's development and ability to interact appropriately with others. As a result of his conditions, father "has particular difficulty managing stressful situations, or interpersonal conflict." He also "has some difficulty managing his own life and following through with responsibilities." Ewell did not believe that father was capable of minimally adequately parenting S unless he was able to show progress in parenting classes, individual mental health therapy to address his *327 "moderately severe mental disorder," and couples counseling.
Father never pursued individual or couples counseling, but he did undergo a mental health assessment at Douglas County Mental Health. Rose Marie Gibbs, who evaluated father and who had not seen the results of Ewell's evaluation, also diagnosed him with a personality disorder and noted that he exercised poor judgment and lacked insight. She referred father for parenting and anger management classes.[5] Gibbs told father that he could return for individual treatment if he wished, but he never followed through on that offer.
Father also participated in a drug and alcohol assessment at ADAPT. He disclosed previous methamphetamine use to ADAPT evaluator Terry Hicks, but he did not acknowledge continuing use of or urges to use the drug. Hicks recommended that father participate in a minimum drug and alcohol education program. Father was referred to that program four times, but he never followed through on those referrals.
Over the course of the next year and a half, DHS offered father and mother extensive services beyond the initial evaluations and referrals. For instance, DHS entered into a second service agreement with parents in which parents agreed to work with a mentor to find suitable housing, to demonstrate the ability to maintain clean and safe housing over time, and to attend parenting classes.[6] Gould was assigned to help parents locate suitable housing and make their home safe for a child. Although Gould found suitable housing in parents' price range, father failed to follow through with the rental applications. Douglas County Developmental Disabilities nurse Jessica Rutter, who also attempted to help parents find housing, similarly reported that parents' failure to follow through with paperwork prevented them from finding a new home.
Parents similarly made no progress toward maintaining the condition of their home.[7] Gould testified that the home lacked running water or bathroom facilities, was being heated using three burners of a gas stove, and was so cluttered that it was unsafe. She talked to parents about cleaning the home, and on her second visit they had done so. Despite that initial effort, parents were unable to maintain the house. When Gould made an unannounced visit to the home in January 2005, the home was again in deplorable condition, and subsequent visits showed no improvement. On one occasion after the unannounced visit, Gould discovered dirty clothes and empty containers everywhere, "guns propped in the corner," "a sauce pan containing vomit" in the bathroom, and sewage in the shower from an overflowing septic tank. The home was so filthy and cluttered that Gould considered it unsafe.[8]
A third team decision meeting was held in February 2005. Although mother and father were present with their attorneys, again none of mother's or father's family members attended. Despite their failure to follow through with any rental applications, mother and father told DHS that they were looking for new housing and were on the Section 8 waiting list. Father agreed to a second evaluation at ADAPT and to random urinalyses. Those services were requested because he had disclosed more extensive past methamphetamine use to Gibbs than he had to Hicks[9] and he had not followed through on *328 his prior referral to a minimum education class at ADAPT.
Although father did not keep his appointment for a second evaluation at ADAPT, he did participate in random urinalyses. Three of father's urinalyses were negative for drug use, but father missed one appointment and tested positive for methamphetamine use in June 2005. Father initially denied that he had used methamphetamine, but he later admitted that he had, explaining that he "went around [with] somebody that I usually never do, and I tried to stay away from [him] to begin with."
DHS also referred father to anger management classes at Valley View Counseling based on Ewell's and Gibbs's reports and allegations that father had abused mother prior to their marriage.[10] Father attended almost three months of classes and, although it appeared that he internalized some of the information presented during the course, he had difficulty following through with his homework and concentrating in class. After three absences, he was expelled from the anger management program.
Father largely failed to follow through with the second service agreement, but he and mother did receive one-on-one parenting training from Ron Wilmot during their visits with S. According to Wilmot, mother showed "no improvement of understanding of parenting concepts." At the end of the training, Wilmot also concluded that mother was not and would never be capable of safely parenting S without constant supervision. When Sweet was informed of the outcome of the one-on-one parenting training that he had recommended, he revised his opinion to conclude that mother could not independently and adequately care for S because she could not acquire or retain the information necessary to make progress.
Although father worked hard, understood the concepts of the training, and was generally appropriate during his interactions with S,[11] Wilmot was concerned about father's ability to provide for safe and suitable housing, his tendency to leave S in mother's care during visits, and his controlling demeanor with mother. When Wilmot visited the camp trailer in May 2005, the septic tank was still overflowing and the floor and surface areas were still littered with clutter and debris. Despite the unsanitary and unsafe condition of the home and mother's demonstrated inability to parent S, father continued to assert to Wilmot that mother could safely care for her child.
Father and mother also visited with S while she was in foster care. Although father actively participated in visits and genuinely seemed to care about S, visiting supervisor Margaret Leonard saw almost no improvement in his parenting skills during the approximately two years that she supervised visits, from fall 2004 through spring 2006. Like the other social service providers working with parents, Leonard noted their inability to follow through with her suggestions.
In February 2006, DHS filed petitions to terminate mother's and father's parental rights. After those petitions were filed, father discontinued visits with S for several weeks. Although he resumed visiting S, the visits stopped altogether when parents moved to Modesto, California, at the end of April.
Shortly before parents moved to Modesto, father's 76-year-old grandmother, Omalie West, called case worker Jessica Hunter to discuss whether she might be a placement *329 resource for S.[12] West acknowledged to Hunter that she could have come forward sooner, but she proposed that S could be placed in parents' care in her home, and she alternatively requested to be certified as a foster parent. Hunter discussed the requests with two supervisors. After deciding that West would not be considered as a placement resource, Hunter wrote West a letter explaining that DHS does not place children with parents after a termination petition has been filed and that her request to be certified as a foster parent had come too late.
Indeed, the dependency court had relieved DHS of its efforts to reunify the family several months before West expressed interest in being a placement resource. By the time West contacted Hunter, S had been in foster care for over a year and a half. During that period, DHS had conducted a diligent relative search for a potential adoptive placement, relying on parents to identify relatives to consider. Parents submitted a list of relatives, including father's sister Stacey Beck and his mother Gail Middleton, but father never mentioned West as a potential placement.
Based on parents' suggestion that DHS consider certain relatives as potential placements, the agency conducted what Shattenkerk described as an "exhaustive relative search," which included contacting both Middleton and Beck. In fact, DHS approved Beck, who lived in Modesto, after a home study required by the Interstate Compact on the Placement of Children. In September 2005, Hunter contacted Beck, who told her that she was still interested in serving as a placement resource for S. Hunter asked Beck why she had not been in communication with DHS, and Beck explained that she believed S's foster family would adopt her, "so she didn't feel that she needed to maintain contact." Hunter explained that DHS "had every intention" of considering her as a placement for S. Hunter then called the Modesto child welfare agency and spoke with the supervisor for the certification and adoption units of that agency. She asked the supervisor how Beck could become immediately certified as a potential placement. Hunter then spoke to the caseworker responsible for certifying Beck, who informed her that Beck would be asked to participate in certain classes to become certified. When Hunter informed Beck of the requirement that she attend those classes in December 2005, Beck withdrew her application.
Father's uncle, Bob West, who also contacted Hunter after parents moved to Modesto in support of Omalie West's request to be a placement resource, explained that the family did not get involved earlier because "we thought it was taken care of [through Beck]" and that the family only became involved once they discovered that Beck would not be a placement resource for S. Omalie West similarly explained that she did not become involved earlier because she thought "everybody was taking care of it." Neither Bob West nor Omalie West contacted DHS until nearly five months after Beck withdrew her application.
At the end of May 2006, father called DHS to request another visit. Hunter discussed the request with her supervisor and others, and eventually the agency determined that visits were not in S's best interests, in part because S had started experiencing anxiety around the visits. Parents did not contest the decision to deny visitation and never requested another visit with S.
At the time of the termination trial in November 2006, parents had been living in Modesto with Omalie West in her two-bedroom home for approximately six months.[13] Consistent with Ewell's prediction that a person suffering from father's personality disorder would have difficulty obtaining and maintaining employment, during his six-month stay in Modesto, father worked for a temporary agency for a single day and did odd jobs for family members in exchange for room and board. He testified that he is planning *330 to enroll in training to become a certified mechanic.[14]
At the trial, father claimed to be planning to enroll in a residential drug treatment program. He admitted that he had used methamphetamine in June 2005 and had lied when he had claimed that the urinalysis was incorrect. Although father does not think he has a current drug problem, he believes that treatment could help prevent him from relapsing again. He also acknowledged that he never followed through on the referral to an ADAPT minimum education course, that he never completed anger management counseling, that he had failed to find housing despite Rutter's and Gould's help, and that he had failed to access any services in California.[15]
For the first time, father also acknowledged during the trial that mother is unable to care for S unsupervised. He testified that mother "gets upset at times, and she just goes ahead to do things and doesn't settle down to think it through, and that's what made me realize she has to be supervised at all times. * * * [She gets n]ervous. If she don't get to go places with me or something at times, she just feels like she's being left behind" and "stomps around mad." Although father claimed that he had realized nine months earlier that mother was unable to care for S, he admitted that he had never before explained his position or his plan to have relatives supervise mother. When he explained how he arrived at this realization, he said only that family members "pointed out" things to him, such as "sometimes she'll be doing something and she'll get frustrated * * * and then she'll get upset and just have a different attitude about things."
Father's plan to ensure that mother would always be supervised when caring for S was to stay with his grandmother, Omalie West, who would coordinate with Bob West, Beck, or "different cousins [who] live there that are in and out all the time" to supervise mother when he is not available. Omalie West testified that "[t]here's so many [relatives that] there would be somebody," including her sister and her four adult grandchildren who "will be there to do anything they can" and are available on short notice. West also said that she has church friends who have agreed to help. West indefinitely committed to coordinate the supervision of mother and S by relatives, but she acknowledged that she may not always be able to supervise. However, she assured the court that "somebody will."
S's foster mother, who is a registered nurse who has experience working with medically fragile children, also testified at the termination trial. She explained that S, who was two years old at the time of trial, is a high-needs child who requires "very close supervision" because she is so active. S's foster mother, who has fostered 10 children and raised four biological children, also testified that parenting S takes "very strong parenting skills, lots of patience and consistency." S also requires frequent high-caloric meals, continued developmental screenings, and consistent treatment for a skin condition. Although S had reached the expected developmental milestones at the time of the termination trial, she has facial features consistent with fetal alcohol syndrome.[16] The foster mother stated that those facial features indicate *331 this child is much more likely than a child who does not have such features to experience developmental problems in the future. S's foster mother testified that S is well bonded to her foster family and that S had begun experiencing anxiety around visits with parents before parents moved. S has not mentioned either of her parents since the visits ended.
As to mother, the trial court found by clear and convincing evidence that mother's cognitive deficiencies render her unfit to parent, and that her condition is seriously detrimental to S, as evidenced by the life-threatening shaking incident that led to S's removal.
As to father, the trial court identified father's lack of effort or failure to obtain and maintain a suitable or stable living situation, his failure to present a viable plan for the return of S to parents' custody, and his mental illness as conduct or conditions that render father unfit to parent. It also found that father's lack of sound judgment regarding safe caregivers for S, coupled with his failure to effect a lasting adjustment after reasonable efforts by social service agencies, was a serious detriment to her welfare. Although father testified at the time of trial that he believed mother incapable of independently parenting S, the court was not convinced by his eleventh-hour change of heart and concluded that S would be placed in danger of harm if returned to his care because father "ha[s not] internalized the safety concerns [unanimously] expressed by others."
The trial court also found that father's plan to have mother supervised by his relatives would not ensure S's safety. Based on Ewell's opinion that father's mental health issues impede his ability to manage stressful situations, the trial court found that it is likely that parents will leave the home in the event of a conflict with father's grandmother. Even if mother is constantly supervised, the court concluded that it is doubtful that parents' plan would ensure S's safety, because, when trained residential staff supervised mother at Safe Haven, an "incident occurred that led to the removal of S[] because of the potential for a life-ending injury." Because S, who has high needs, has not bonded with parents, and there is an available adoptive resource, the trial court concluded that termination was in S's best interests. Both parents appeal.
We begin by examining the applicable legal standards and then apply those standards to each parent's case. ORS 419B.504 provides, in part:
"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.
"* * * * *
"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.
"* * * * *
"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."
The statute requires a two-step analysis. We first examine whether a parent has engaged in conduct or suffers from a condition that is seriously detrimental to the child. If so, we determine whether it is improbable that the child will be integrated into the parent's home within a reasonable time. State ex rel Dept. of Human Services v. Smith, 338 Or. 58, 80-81, 106 P.3d 627 (2005); *332 State ex rel. SOSCF v. Stillman, 333 Or. 135, 145-46, 36 P.3d 490 (2001). Termination requires that the state prove unfitness by clear and convincing evidence; that is, evidence that makes it highly probable that the parent is unfit at the time of the termination trial. State ex rel Dept. of Human Services v. Simmons, 342 Or. 76, 95-96, 149 P.3d 1124 (2006); State ex rel Dept. of Human Services v. Rardin, 340 Or. 436, 448, 134 P.3d 940 (2006); State ex rel Dept. of Human Services v. Hinds, 191 Or.App. 78, 84, 81 P.3d 99 (2003). It also requires clear and convincing evidence that "the state [made] reasonable efforts to assist parents in making the adjustments to enable them to become minimally adequate parents." State ex rel SOSCF v. Frazier, 152 Or.App. 568, 582, 955 P.2d 272, rev. den., 327 Or. 305, 966 P.2d 220 (1998) (citation omitted). Whether the state's efforts were reasonable depends on the particular circumstances. Id.
With those principles in mind, we turn to the evidence regarding parents' unfitness. We recognize that the state must prove that each parent is unfit by clear and convincing evidence, but we treat mother's and father's appeals together because the issues are inextricably intertwined in this case. We first examine whether each parent has engaged in conduct or suffers from a condition that supports terminating their parental rights. In so doing, we consider whether the fact that parents are living with Omalie West means that their conduct or conditions would not be seriously detrimental to the child because West has offered to ensure supervision of mother when she is caring for S. We conclude that parents' plan for family supervision of mother does not ensure constant supervision, resulting in S facing a significant risk of harm from parents' conduct if she is returned to their care. For the same reason, we also conclude that it is unlikely that S could be integrated into parents' home within a reasonable amount of time. Lastly, we find that termination is in S's best interests.
We begin by examining mother's conduct or condition. Every social service provider who considered whether S could be left in mother's careincluding house mother Barbara Hastings, family resource worker Karen Gould, community health nurse Wendy Zyzniewski, psychologist David Sweet, and parenting trainer Ronald Wilmottestified that she cannot minimally adequately parent S without constant supervision. Mother's cognitive limitations render her unable to learn how to care for or appropriately respond to S. The shaking and near-drowning incidents at Safe Haven demonstrate that she needs constant supervision to avoid risking the child's life or health. In short, mother should never be left alone with S. We find that mother is incapable of providing adequate care for S and that her conduct and condition are seriously detrimental to the child.
We turn to father's conduct and conditions, specifically his alcohol and drug issues, his mental health issues, his failure to obtain and maintain a suitable housing situation in which S is protected from mother, and his lack of effort to adjust his conduct or conditions. Although father's conduct or conditions might not support termination when considered in isolation, they are directly and seriously detrimental to S when considered in the context of his relationship with mother. Father's lack of effort to obtain and maintain a stable and suitable living situationnamely, one in which S will be protected from the dangers she would face in mother's carerenders him unfit to parent S. Father historically has failed to recognize the importance of ensuring that mother is constantly supervised when S is in her care and has demonstrated an unwillingnessand inabilityto protect S from mother. We are not convinced by his eleventh-hour testimony that he now understands mother's limitations and the real need for constant supervision. Although father claimed to have formulated a family-supervision plan to have his relatives supervise mother nine months before the termination trial and three months before parents moved to Modesto, the trial was the first time he explained it to DHS or to the court. The trial was also the first time father purported to acknowledge mother's inability to parent S. Until his trial testimony, father had maintained the steadfast belief that mother was an adequate parent in the face of overwhelming evidence to the contrary *333 (including the near-drowning and shaking incidents at Safe Haven).
Father's ostensible realization that mother needs supervision failed to convince the trial court that he "has internalized the safety concerns expressed by others." We give "considerable weight" to the trial court's findings on credibility due to its ability to observe the witnesses and their demeanor, State ex rel. Juv. Dept. v. Geist, 310 Or. 176, 194, 796 P.2d 1193 (1990), but even if we did not defer to those findings, father's testimony falls short. He testified that he now knows that mother requires supervision because of "things pointed out" to him by family members, specifically that mother "gets upset at times, and she just goes ahead to do things and doesn't settle down to think it through," that mother gets "nervous," and that she "stomps around mad." Those statements do not demonstrate a complete or accurate understanding of mother's limitations or of the dangers those limitations would pose to S if the child were left unsupervised in mother's care. Without such an understanding, father's plan is nothing more than a last-ditch effort to mollify the authorities that he has passive-aggressively resisted, consistent with Ewell's description of his personality disorder, throughout this case.
Also consistent with his personality disorder and his ADHD diagnosis, father has a history of not following through on his plans. From the outset of this case, father acknowledged the need to find safe housing for S, and yet failed to follow through by submitting rental applications obtained by Gould. Rutter also noted that father's failure to follow through with paperwork prevented parents from locating a suitable home. Father also failed to maintain parents' house in a sanitary condition, despite having been toldand agreeingthat the home was unsafe. Father was referred to alcohol and drug education four times but never followed through on those referrals. Although father attended and appeared to benefit from anger management classes, instructor Lynda Mason testified that he had difficulty following through with homework, and he was eventually expelled for missing more classes than the program allows. In sum, father's repeated failure to uphold his promises to social service providers suggests that he will also fail to follow through on his promise to ensure that mother is constantly supervised. We conclude that father's failure to completely and accurately recognize mother's limitations renders him unable to protect S from harm by mother, and, consequently, that his condition is seriously detrimental to S.
We next consider whether it is improbable that S will be integrated into parents' home within a reasonable time. Although father claims that he is "in process," and that the trial court therefore erred by concluding that he has failed to effect a lasting adjustment after reasonable efforts by available social service agencies, the evidence does not show that father is "in process" or "seeking to change [his] behavior." Cf. State ex rel Dept. of Human Services v. Huston, 203 Or.App. 640, 658, 126 P.3d 710 (2006) ("Indeed, mother is like thousands of parents in Oregon who are `in process'parents who may initially fail to reckon with the potential consequences of their behavior on their children but are seeking to change their behavior to become better parents."). Just as he failed to successfully complete many of the services offered to him in Oregon, he has failed to avail himself of any services since parents moved to Modesto. There is no evidence that father possesses "the required motivation to change [or has] demonstrated [his] ability to change." Id. Father's inability to follow through, coupled with his failure to acknowledge or protect against the dangers S would face in mother's care, establish a "[l]ack of effort * * * to adjust the circumstances of the parent, conduct, or conditions to make it possible for [S] to safely return home." ORS 419B.504(5).
Father argues that he has made a lasting adjustment in that he obtained a stable living situation in Omalie West's home more than six months before trial.[17] Similarly, *334 mother argues that living with Omalie West, with West serving as S's permanent guardian, would prevent her mental deficiencies from being "seriously detrimental to S." The record in this case reveals several reasons that father's plan would not work. Even if parents' living situation with West is stable,[18] it is not suitable because there is clear and convincing evidence that the family will not be able to ensure that mother is constantly supervised when caring for S.
First, parents' plan to have relatives supervise mother lacks sufficient detail about who will be supervising mother and when in order to ensure that S will not be left alone with mother. When West contacted Hunter in April 2006, she did not offer to constantly supervise mother; rather, she offered that parents could live in her home or that she could be certified as a foster parent. At trial, West testified that there are so many relatives in Modesto that there would always be someone available to supervise. She did not, however, commit to constantly monitoring mother or offer any detail about how others' supervision would be coordinated other than to say that her family is "together a lot and we do a lot together" and that her house is a "busy house" with grandchildren and "great grand kids that are in and out." The lack of detail in the proposed supervision plan demonstrates that West does not have a true understanding of the level of monitoring needed to ensure S's safety. The proposed plan is simply insufficient to assure that S will never be left alone with mother.
Second, the plan proposed by parents would require frequent and accurate communication among family members. Although there are many relatives in the Modesto area, the record reveals that those relatives have already encountered difficulty communicating about S. Although Beck withdrew her application to serve as S's foster parent in December 2005, Omalie West did not learn of the withdrawal until almost five months later in April 2006. West explained that she did not step forward in the case sooner because she "thought everybody was taking care of it * * * [and that] the younger generation were doing it." The "younger generation" which father, Omalie West, and Bob West all testified will be relied upon to supervise motherhas historically failed to communicate with West about the care of S, and the record reveals no reason that the family will be able to communicate more effectively in the future. As well-intentioned as Omalie West may be, the family's lack of communication, particularly concerning the family's role in caring for S, calls into question her ability to ensure that mother will be constantly supervised. Father's failure to develop realistic strategies to protect S from the dangers she would face in mother's care is further evidence of his "lack of effort * * * to adjust the circumstances of the parent, conduct, or conditions to make it possible for [S] to safely return home." ORS 419B.504(5).
Father correctly contends that failure to present a viable plan cannot provide the basis for a finding of unfitness. See Rardin, 340 Or. at 444-45, 134 P.3d 940. Failure to present a viable plan can, however, establish that it is improbable that the child will be integrated into the home within a reasonable period of time due to conduct or conditions not likely to change. ORS 419B.504; Rardin, 340 Or. at 445, 134 P.3d 940 (explaining that the termination court must first focus on a parent's unfitness rather than a "lack of a viable plan" because that relates to the second step of the Stillman analysis). Based on the likelihood that mother and S will be left unsupervised if S is returned to parents, and that this high-risk situation is unlikely to improve, we conclude that integration of S into father's home is improbable within a reasonable period of time.
We next consider whether DHS made reasonable efforts to assist parents. Mother argues that DHS did not make reasonable efforts to address her condition because the agency provided mother only with "normal services which are provided for parents" that "were never going to solve the problem of mother's disability" and were therefore "really *335 no services at all." We disagree. The agency provided services designed to best meet mother's needs. The fact that the services were not ultimately successful does not undermine the reasonableness of offering them. When Sweet first evaluated mother, he suggested she be provided with one-on-one training to learn the specific techniques and skills necessary to care for a young child. It was not until Shattenkerk informed him that mother had unsuccessfully participated in one-on-one parenting training at Safe Haven and again with Wilmot that Sweet concluded that further training would be futile. As he explained at trial, "[i]t works with some people[, but] it apparently didn't work well with her." We conclude that DHS's efforts in assisting mother to become a minimally adequate parent were reasonable.
There is clear and convincing evidence that mother's mental deficiencies are "of such a nature and duration as to render [her] incapable of providing proper care for [S] for extended periods of time," and that mother's condition would be seriously detrimental to S because the plan for Omalie West to coordinate people to supervise mother at all times is likely to fail. ORS 419B.506. For the same reason, father's inability to protect S from mother or effect a lasting adjustment to that condition would be seriously detrimental to S if she were returned to parents' care. Although the state made reasonable efforts to assist mother, and despite Omalie West's offer to supervise, we conclude that integration of S into parents' home is improbable within a reasonable amount of time because the plan presented by parents at trial will not ensure that mother is constantly supervised in S's presence.
Lastly, we find that termination of parents' rights is in the child's best interests. S has not bonded with parents and had begun experiencing anxiety around visits with parents about three months before those visits ended. There is an adoptive placement available who is well bonded with S and who has demonstrated the ability to provide for her high needs, as well as her needs for "very strong parenting skills" and "lots of patience and consistency." There is clear and convincing evidence that parents lack the ability to meet those needs based on their historical inability to follow through with positive recommendations and based on Ewell's evaluation that father is not capable of providing a stable home environment. Accordingly, we are persuaded that termination of their parental rights is in S's best interests.
Affirmed.
NOTES
[1] In fact, the pen was so filthy and the dog so emaciated that Brugato called animal control after leaving the property.
[2] The record does not reveal whether father contacted his grandmother at that time. Father and mother moved in with father's grandmother in April 2006, almost two years after the second team decision meeting in August 2004.
[3] DHS referred father for a substance abuse evaluation because father had been convicted of driving under the influence several years earlier and had admitted to past alcohol and methamphetamine use.
[4] While mother was staying at Safe Haven, Amy Shattenkerk replaced Brugato as the family's caseworker, but Brugato was assigned to investigate the shaking incident.
[5] Gibbs did not refer father for mental health treatment, only because personality disorders are not considered treatable conditions by Douglas County Mental Health.
[6] Parents also agreed to stay on the Southern Oregon Regional Brokerage waiting list. SORB is a service that helps developmentally delayed clients formulate a plan "that's meaningful for their lives and get the resources together and have that paid for." At the time of trial, mother was on the waiting list.
[7] While S and mother were at the maternity home, father moved out of the home Brugato visited and into a camping trailer on his father's property.
[8] Although Rutter worked with parents through April 2006, Gould stopped working with them in February 2005, after parents cancelled six appointments in 12 weeks.
[9] At the termination trial, father claimed to have told Hicks about his current urges to use methamphetamine. Hicks testified that father never disclosed current urges to use the drug, and that if he had, she would have referred him to either intensive outpatient or residential inpatient treatment. During her mental health assessment, Valley View counselor Lynda Mason also suspected that father "ha[d] not reported his substance use accurately."
[10] Mother stayed at a battered women's shelter before she married father. Several professionals working with father and mother expressed concern about the dynamics between mother and father, including Ewell, who noted that father's choice to partner with a person whose level of cognitive functioning is significantly lower than his raised concerns about father controlling and manipulating mother. At the time of trial, both parents denied that their relationship is abusive, and DHS presented no evidence of abuse.
[11] Wilmot and visiting supervisor Margaret Leonard both described father grabbing S by her clothing and swinging her around the room. Although Leonard described it as "playful behavior," both Wilmot and Leonard agreed that it was unsafe and upsetting to S.
[12] Jessica Hunter replaced Shattenkerk as the family's caseworker approximately two months before DHS filed the termination petition.
[13] Father's uncle, Bob West, also occasionally stays at the home.
[14] Omalie West testified that the reason father did not yet have full-time employment, despite the fact that he had lived in Modesto for six months at the time of trial, was that he had to be "coming back to court all the time." The record reveals two court appearances after the termination was filed: a first appearance in April 2006 and a permanency hearing in September 2006.
[15] Father testified that he has assisted mother's efforts to obtain services through Valley Mountain Regional Center, which provides services to people with developmental disabilities. Pam Kidroske, intake coordinator at Valley Mountain, testified that her agency could provide "supportive living services where we have agencies that we pay to go in and work with [developmentally disabled people] in their homes, and that's with parents that have children," but that such services would only be offered at most a couple of hours a day, five days a week. Kidroske further testified that she was aware of no agency in the Modesto area that would be able to provide the necessary supervision of mother.
[16] S has a "very thin upper lip," "wide-set eyes that are almost almond shaped," "[a] flat bridge to her nose," and a small body. S's foster mother testified that, while those features are not by themselves diagnostic of fetal alcohol syndrome, to a medically trained person they indicate that "something is amiss."
[17] While "there is no statutory requirement that a parent be able to care for the child `independently,'" ORS 419B.504 permits a finding of unfitness if a parent's inability to independently parent works to the detriment of the child. Smith, 338 Or. at 86, 106 P.3d 627.
[18] We are not convinced that is the case, given that father's personality disorder causes him "significant difficulty getting along with other people" and "managing stressful situations or interpersonal conflict." We agree with the trial court's conclusion that "it is reasonable to conclude that Father would leave Ms. West's home in the event of a disagreement."