Argued and submitted January 19, resubmitted en banc July 28, affirmed November 24, 2010, petition for review denied February 17, 2011 (349 Or 654)

In the Matter of C. D. T.,
a Child.

## DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

## D. M. T.,
*Appellant.*

Linn County Circuit Court
J060312;
Petition Number 06072JTF;
A142473

243 P3d 836

128

Margaret H. Leek Leiberan argued the cause for appellant. With her on the brief was Jensen & Leiberan.

Harry B. Wilson, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Brewer, Chief Judge, and Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, Rosenblum, and Sercombe, Judges, and Carson, Senior Judge.

ORTEGA, J.

Brewer, C. J., concurring.

Wollheim, J., dissenting.

Sercombe, J., dissenting.

## ORTEGA, J.

Father appeals a judgment terminating his parental rights to his son. Among other grounds for termination, the juvenile court found that father was unfit under ORS 419B.504 because of criminal conduct, emphasizing that, under the conditions of father's post-prison supervision (PPS), "[f]ather is not authorized to have contact with his child." (Underscoring omitted.) We affirm because (1) father is characterized by a condition—having been convicted of first-degree encouraging child sexual abuse, ORS 163.684, and therefore being subject to a PPS condition that restricts any contact with minors—that is seriously detrimental to child; (2) as a result of his PPS condition, father was unlikely to be allowed to integrate child into his home for about two years, a period that is not a reasonable time for child to wait; and (3) termination is in child's best interests. Because we affirm on that basis, we do not consider whether the juvenile court erred by also terminating father's parental rights because of extreme conduct under ORS 419B.502.

On *de novo* review, ORS 19.415(3)(a), we find the facts as follows. In June 2006, when child was three and one-half years old, police investigated reports that father possessed child pornography. Father acknowledged to a detective that he saved child pornography on his computer, viewed child pornography videos on a regular basis, had been viewing such videos since approximately 2000, and found them sexually stimulating. The videos included images of young children being forcibly raped by adults. Father's sex offender therapist later noted that the materials involved were "extremely graphic displaying the sexual abuse of both male and female children as young as four" and that father's "interest in prepubescent children has been recurrent, intense, and no doubt involving sexual arousal * * *." Father was charged with 25 counts of first-degree encouraging child sexual abuse.

Father has had little contact with child since June 2006. During that year, father spent slightly over six weeks in jail before being released. According to father, there was confusion about whether his release agreement prevented him from seeing child. In January 2007, father underwent a

psychological evaluation arranged by his attorney; the evaluator concluded that father would present no risk to child during supervised visits. In March, father pleaded guilty to eight counts of first-degree encouraging child abuse. At the end of May, father provided the Department of Human Services (DHS) with a copy of a court order from Judge Baisinger—who later signed the judgment in father's criminal case—stating that father was allowed to have supervised visits with child. In July and early August, before father was incarcerated, he had three supervised, one-hour visits with child. On the recommendation of child's therapist, father had no visits with child during father's incarceration.

In May and June 2007, shortly before going to prison, father sought a referral from DHS to a sex offender treatment program. DHS did not provide a referral, and father did not engage in any treatment before going to prison. Then, according to father, no sex offender treatment programs were available in prison.

Father was incarcerated from August 2007 to September 2008. Other components of his sentence continue to affect his ability to have contact with child. On seven counts, father was sentenced to 60 months of supervised probation, including a special condition that he "[h]ave no contact with minors except as authorized by DHS"; on the remaining count, he was sentenced to 18 months of imprisonment and 36 months of PPS. According to his parole officer, Michael, father will be on PPS until August 2012. Among his PPS conditions are requirements that he complete sex offender treatment, submit to polygraphs, and have no contact with minors.[1] Thus, at the time of the termination hearing, father was not allowed to have any contact with child.

_____

[1] In his dissent, Judge Wollheim states that father "is subject to a condition of probation that is within the control of DHS; father may have contact with child if DHS authorizes that contact." 239 Or App at 157 (Wollheim, J., dissenting). Although that probation condition is within DHS's authority, father's PPS condition is not. See ORS 144.102(1) (providing, in part, that "[t]he State Board of Parole and Post-Prison Supervision or local supervisory authority responsible for correctional services for a person shall specify in writing the conditions of post-prison supervision imposed under ORS 144.096"). As noted, this opinion focuses on father's condition of being subject to a PPS condition that prevents him from being able to provide child with a stable home.

Michael explained that contact "includes telephones, letters, going through a third party, anything of that nature."

As required by his PPS conditions, father began sex offender treatment promptly after being released from prison. At the time of the termination hearing, in January and February 2009, he was four months into a 22- to 26-month cognitive behavioral program involving systematic lifestyle restructuring. The cognitive behavioral treatment offers tools needed to develop a relapse prevention plan. According to Caywood, father's therapist for that program, father was consistently attending the weekly group sessions and was "in the beginning stages of treatment and working to understand * * * the cognitive distortions and so forth that many offenders struggle with because of their own shame and fear." Concurrently with that treatment, Caywood wanted father to participate in laboratory phallometric testing and any recommended behavioral treatment. That additional program would involve assessments with physiological arousal measurements and would teach specific behavioral techniques to subdue and curtail inappropriate sexual interests. The behavioral intervention component usually lasts three to four months and may involve a later reassessment to check effectiveness. Caywood explained that he would get more information from the behavioral intervention program, but a referral to that program usually is more effective when the person is well into the treatment process. Father was less than a quarter of the way through his treatment program.

Michael testified that, in order to "earn that privilege" of modifying his PPS conditions to allow contact with child, father must comply with all PPS conditions and conditions of treatment, pass polygraphs, and show progress in treatment. Just before trial, father e-mailed mother, thereby violating a PPS condition that he not contact her. He asked mother to call Michael and request that the condition be removed; he also asked mother to conceal the contact that had already occurred. The expected sanction for father's PPS violation was a loss of computer privileges and time on work crew. Caywood found "the level of manipulation * * * [to] be a concerning issue." Michael testified that father has "got an uphill battle right now at this point to prove that what he actually has stated to me has been the truth."

Michael and Caywood together would decide whether father should be allowed unsupervised contact with children. If father developed a safety plan that was approved by Caywood and the PPS sex offender unit, then contact could be considered. Michael had not yet had any discussion with Caywood about the possibility for father to have contact with child, but, if Caywood agreed, she would be open to supervised or telephone contact.

Although Caywood and Michael testified that father might be able to have contact with child at an earlier time, they agreed that father is unlikely to be able to integrate child into his home for about two years. Caywood testified:

"Q. Okay. Am I also correct that there is nothing in the presentation of [father's] case at this point that would conclude [sic] you to think that he would be appreciably below that sixteenth month floor for reintegration into a family?

"A. No, I think the approach and the agenda he's expected to complete and address will take pretty close to two years."[2]

Michael testified similarly about the likely time frame for father to have permission to integrate child into his home:

"Q. All right. Your testimony, at least as I would characterize it, was to the effect that with the people that you're supervising, no one has been able to regain care of their child on an unsupervised basis until near the end of their program, is that correct?

"A. Correct.

"Q. And the programs run two or three years, also correct?

"A. Yes.

"Q. Has [father] done anything to cause you to conclude that his time frame would likely be less than that two to three years?

---

[2] Father asserts that he could integrate child into his home in six to 18 months. He relies on Caywood's testimony that, "as a standard of practice," integration generally takes six to 18 months, beginning with closely supervised visits, and that, consistently with that approach, he would recommend that contact between father and child begin with "very carefully supervised, structured visits." When asked specifically about the likely time frame in which father might be able to integrate child into his home, however, Caywood testified as quoted above.

"A.    No. Not in my indications and not with speaking with John Caywood."

Thus, it is improbable that father will obtain a change in his PPS to allow him to integrate child into his home in less than two years.

The dissents conclude that the testimony of Caywood and Michael does not constitute clear and convincing evidence that it is likely to be two years before father would be allowed to integrate child into his home; in the dissents' view, Caywood's testimony is too equivocal, and Michael's testimony is entirely reliant on Caywood's. 239 Or App at 147-48 (Wollheim, J., dissenting); 239 Or App at 160 (Sercombe, J., dissenting). Although Caywood testified that he wanted more information to predict the path of father's treatment and the risk that father might engage in hands-on abuse of a child,[3] it would be surprising if a therapist did not want more information about his client. Caywood's acknowledgment that more information would be useful does not undermine his testimony, based on his experience and the information that he did have about father, that integration was unlikely to be possible for about two years. Although Caywood gave different time frames for possible "contact" between father and child and for unsupervised contact to be "within the realm of possibilities," those answers were in response to different questions than the question when *integration* was *likely*. The time frame for contact or visits, supervised or unsupervised, naturally may differ from the time frame for integration of a child into a parent's home, and the time frame that is possible naturally may differ from the time frame that is likely for integration. Acknowledging those differences does not undercut the force of Caywood's testimony about the probable time at which integration might be allowed: two years.

Likewise, Michael testified that, if father were compliant with all PPS conditions, she would be unlikely to disagree with a hypothetical recommendation from Caywood

---

[3] Our analysis relies on clear and convincing evidence that father is unlikely to obtain a change in his PPS condition that would allow him to provide child with a stable home within a reasonable time. We do not reach any conclusion regarding any risk that father would abuse child if child were returned to father.

that father be allowed unsupervised contact in six months. Michael was clear, however, that she believed—based on her experience supervising other sex offenders, her own observations of father, and her discussions with Caywood—that father would be unlikely to be allowed to have child in his care, unsupervised, before two years had passed. The juvenile court found both Michael and Caywood (but not father) to be credible witnesses. Their testimony constitutes clear and convincing evidence that father is unlikely to be able to integrate child into his home within two years.

Meanwhile, child, at age six, had not seen father at all since the summer of 2007, a year and a half before the termination hearing. Shortly before the termination hearing, child's therapist, Monahan, noted that child asked where father was but had no obvious emotional reaction to talk of father. Monahan testified that, when she told him that he would not have visits with father immediately, child "seemed a little sad, but nothing really extreme and he went back to the Play-Doh."

Child has significant developmental and emotional needs. As a result of premature birth, child is about one and one-half years delayed developmentally. He also suffers from severe headaches and possibly from seizures. He has been diagnosed with borderline cognitive function and adjustment disorder and is at risk for developmental behavioral and emotional issues. Because of child's cognitive delays, transitions are extremely difficult for him. In addition, child has traits of post-traumatic stress disorder (PTSD) and reactive attachment disorder (RAD), although he does not have the full-blown disorders.

Transitions are likely to continue to be difficult for child and to cause him to regress, according to Stoltzfus, a psychologist who evaluated child. PTSD, adjustment disorder, and RAD are treatable but will "re-emerge quickly if he's put back into a neglectful or abusive environment." Even without neglect or abuse, change is very hard for child, "[a]nd every change he endures will set him back. And it doesn't mean he can't pop back eventually, but it just takes longer." Stoltzfus explained that each transition increases the risk

that child will develop RAD, although child probably could manage a transition into another "very stable home."

Stoltzfus's evaluation was consistent with the observations of child's occupational therapist, Cox, that "any changes are gonna be challenging for [child]." Child may have outbursts if, for example, a toy that he likes is out of place in Cox's office. Cox explained that any change can cause child to need to relearn an entire skill. If child's clothes are in a different place, for example, child needs "help redoing that whole task. So if you can imagine, you know, having, you know, his whole life changed where he lived or anything like that, it would be kind of starting out at ground zero again and re-teaching him those things again."

In addition to needing a very stable home, child needs, according to his therapist, "permanency with someone who is really going to be paying attention to his special needs." Monahan testified that child currently "seems pretty confused about family roles and family, who's supposed to be doing what and who cares about him and who doesn't, what family he has, what family he doesn't have." In Monahan's view, child needs permanency before the end of father's sex offender treatment program:

"Q. Developmentally does [child], given this confusion he has about family, need a permanent family at this point?

"A. Yes, he does.

"Q. Do you think it would, in your professional opinion, cause him harm developmentally and in terms of ability to maintain forming [sic] attachments to have to wait two years or up to two years to have a permanent family situation designated?

"A. Yes, I think it would."

According to child's service providers, child is bonded to his maternal grandmother, who is his current placement and wishes to adopt him, and she is able to meet his significant needs. Monahan testified that child has stabilized in his grandmother's care. Indeed, in Stoltzfus's view, the care that child received from his grandmother for an extended period prevented development of the full-blown diagnoses of PTSD and RAD.

The juvenile court terminated father's parental rights on multiple bases, one of which was that father is unfit under ORS 419B.504(6) because of criminal conduct that impairs his ability to provide adequate care for child. Father appeals.

We agree with the juvenile court that termination was proper under ORS 419B.504, which provides:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

> "(1)  Emotional illness, mental illness or mental retardation of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.

> "(2)  Conduct toward any child of an abusive, cruel or sexual nature.

> "(3)  Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

> "(4)  Physical neglect of the child or ward.

> "(5)  Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

> "(6)  Criminal conduct that impairs the parent's ability to provide adequate care for the child or ward."[4]

---

[4] ORS 419B.504 provides that, "[i]n determining such conduct and conditions, the court *shall consider but is not limited to* the following [enumerated subsections.]" (Emphasis added.) The statute thus requires us to consider each enumerated subsection in determining a parent's conduct or conditions that establish whether the parent is unfit and whether integration is improbable within

That statute requires us to decide (1) whether the parent is unfit—that is, whether the parent has engaged in conduct or is characterized by a condition and whether the conduct or condition is seriously detrimental to the child—and (2) whether, given the parent's conduct or condition, it is improbable that the child may be integrated into the parent's home within a reasonable time. *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005); *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). A "reasonable time" is measured by "a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20). If grounds for termination are proved, then we decide whether termination is in the child's best interest. ORS 419B.500; *Smith*, 338 Or at 79. The factual basis for termination, unless admitted, must be proved by clear and convincing evidence. ORS 419B.521(1).

As pertinent to our analysis, father contends that his criminal conduct does not present a risk of harm to child and that, given DHS's lack of reasonable efforts to provide sex offender treatment for father before his incarceration and to provide visits between father and child, DHS failed to prove that integration into father's home is improbable within a reasonable time due to conduct or conditions not likely to change. Father further contends that termination of his parental rights is not in child's best interests. DHS responds that father is unfit because of sexually abusive criminal conduct, that the portions of ORS 419B.504 applicable to father do not require a showing of reasonable efforts, that child cannot be integrated into father's home within a reasonable time, and that termination is in child's best interests. We

---

a reasonable time. Under subsection (5), then, we must consider a parent's failure "to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." Nothing in the statute, however, elevates any subsection above another. Thus, although we must consider reasonable efforts as provided in subsection (5), a lack of proof of a condition under subsection (5) does not mean that we must reverse the termination of parental rights if another basis for termination is proved and if the statutory requirements are satisfied in all other respects. In this case, we have considered the conduct and conditions enumerated in ORS 419B.504(1) to (6), but we limit our discussion to a single condition— restrictions on contact with child resulting from father's PPS—that we find dispositive here.

agree that each of the statutory requirements for termination under ORS 419B.504 was proved.

◾ First, father is unfit because, at the time of the termination hearing, he was subject to a PPS condition that he have no contact with minors, and father's condition is seriously detrimental to child. That condition is not enumerated in ORS 419B.504, but it nevertheless may be considered in the unfitness analysis. *See Stillman*, 333 Or at 149 (concluding that the father's incarceration and residence in halfway house, which precluded him from personally caring for children or otherwise maintaining custodial parental role, could be considered a "condition" under ORS 419B.504); *State ex rel Dept. of Human Services v. Keeton*, 205 Or App 570, 582, 135 P3d 378 (2006) (considering "sequellae" of past criminal conduct in assessing the mother's conduct and its detriment to her children). Father's condition, in conjunction with his earlier incarceration, has prevented and will continue to prevent him from providing a stable home to child for a prolonged period that is seriously detrimental to child. According to treatment providers, child has made great progress while in his grandmother's care, but he still needs a stable environment to prevent him from developing full-blown RAD. Unlike the children in *Stillman*, who were generally well-adjusted and attached to the father and suffered only some anxiety about their future as a result of the father's incarceration, 333 Or at 150-53, child here has a significant need for stability to avoid regression and severe emotional harm. Father's condition leaves child without the stable home that child needs and thus is seriously detrimental to child.

◾ Second, child's integration into father's home is improbable within a reasonable time due to conditions not likely to change. Child cannot wait as long as the two years likely required to change father's PPS so as to allow him to integrate child into his home. The statutory definition of "reasonable time" requires a child-specific inquiry and "testimony in psychological and developmental terms regarding the particular child's requirements." *Id.* at 146; *see also State ex rel SOSCF v. Freeman*, 174 Or App 194, 204-05, 23 P3d 1009, *rev den*, 332 Or 430 (2001) (noting that the legislature amended the time for integration from "in the foreseeable future" to "within a reasonable time," as defined by the child's

emotional and developmental needs; those amendments "shifted the statute's focus from the parent to the child in the sense that the time frame for integration now is to be measured by the child's needs, not by the parent's potential for reform"). Here, child's therapist testified that waiting up to two years for permanency will be harmful to child, who already has been diagnosed with adjustment disorder and is at risk for developing full-blown PTSD and RAD. Father will likely need two years before he could obtain approval from his parole officer to integrate child into his home. Thus, at the time of the termination hearing, it is improbable that father's condition would change, allowing integration of child into father's home, within a reasonable time as measured by child's needs.

In his dissent, Judge Wollheim takes a different view, contending that DHS can meet its burden to prove that integration of the child into the parent's home "is improbable within a reasonable time due to conduct or conditions not likely to change," ORS 419B.504, only "by showing that services have failed or will fail."[5] 239 Or App at 154 (Wollheim, J.,

---

[5] The dissent cites *State ex rel SOSCF v. Frazier*, 152 Or App 568, 955 P2d 272, *rev den*, 327 Or 305 (1998), and *State ex rel Dept. of Human Services v. R. O. W.*, 215 Or App 83, 99, 168 P3d 322 (2007), for the proposition that, in all unfitness cases, DHS must show that it has made reasonable efforts to help the parent become minimally adequate. Those cases, however, involved different legal and factual determinations than this case, and they do not impose such a broad requirement. In *Frazier*, we addressed reasonable efforts in the context of ORS 419B.504(5), which requires a court to consider the "failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." 152 Or App at 581-83, 601. In *R. O. W.*, the mother was unfit because cognitive disabilities made her unable to safely care for the child without constant supervision; the father was unfit because he was unable to protect the child from the mother and, as pertinent under ORS 419B.504(5), had not adjusted that circumstance despite DHS's reasonable efforts. 215 Or App at 100-03. Rejecting the mother's argument that DHS had not made reasonable efforts, we found DHS's efforts reasonable and concluded that, as pertinent under ORS 419B.504(1), the mother's mental deficiencies were " 'of such a nature and duration as to render [her] incapable of providing proper care for [the child] for extended periods of time.' " *R. O. W.*, 215 Or App at 105 (first bracketed material in *R. O. W.*). Thus, reasonable efforts were part of our analysis of the mother's unfitness because of her mental deficiencies; if remediable, those deficiencies might not render her incapable of caring for the child for an extended period. In neither case did we hold, as the dissent advocates, that a lack of reasonable efforts in the past means that termination is error, regardless of the parent's condition at the time of the termination hearing and regardless of whether it is improbable that a change in that condition could be effected so as to enable integration within a reasonable time.

dissenting). Certainly, unless excused from doing so, ORS 419B.340(5), DHS is required to make reasonable efforts during dependency proceedings. The issue at this stage of the case, however, is whether "integration of the child or ward into the home of the parent or parents *is* improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504 (emphasis added). The legislature's use of the present tense requires the court to decide the improbability of integration due to conduct or conditions not likely to change *at the time of the termination hearing*, not to decide whether the parent's conduct or condition might have been susceptible to change at some point in the past. *See State ex rel Dept. of Human Services v. Rardin*, 340 Or 436, 447, 134 P3d 940 (2006) (holding that use of present tense in "the parent or parents are unfit," ORS 419B.504, means that court must consider whether the parent is unfit at time of termination hearing, not whether the parent was unfit at some point in past). The legislature's choice of verb tense in ORS 419B.504 takes on particular force in the context of other provisions of the Juvenile Code that require, during proceedings that precede any termination hearing, a determination whether DHS "has made reasonable efforts." ORS 419B.185(1)(a), (c); ORS 419B.340(1); ORS 419B.476(2)(a); *see also* ORS 419B.337(1)(b) (requiring, in removal order or order continuing care, finding whether "[r]easonable efforts * * * have been made"); ORS 419B.498(2)(b)(C) (reason not to file termination petition where court or citizen review board determined that DHS "did not make reasonable efforts"). If the legislature had intended to require a finding regarding past reasonable efforts in every ORS 419B.504 case, it knew how to do so. It chose not to.

We hasten to add that, in some cases, DHS's failure to make reasonable efforts may be relevant to the determination regarding integration. In *Keeton*, for example, we concluded that the state had failed to prove that the children could not be integrated into the mother's home within a reasonable time due to conduct or conditions not likely to change. 205 Or App at 583. We assumed, without deciding, that the mother's "condition as an untreated sex offender" was seriously detrimental to her children, but concluded that the state had failed to prove that that condition was " 'not

likely to change' " or that integration was " 'improbable within a reasonable time.' " *Id.* The record there showed that the mother was committed to following through with treatment, but DHS had failed to make a timely referral for such treatment. *Id.* at 573-75. The children, who were doing well and who wanted to return to the mother, could be returned to her after she began treatment but before she completed it, according to a psychosexual evaluator. *Id.* at 573, 575-76. Thus, the condition that prevented the children's integration into the mother's home (the mother's failure to begin sex offender treatment) could be ameliorated within a reasonable time, as of the termination hearing, if DHS provided a referral.

Those facts are markedly different from the facts in this case. Here, father's condition is his PPS, which prevents him from providing a stable home to child. As of the termination hearing, his PPS conditions were unlikely to change to allow integration for two years, regardless of whether DHS provided any services at that time. Integration thus is improbable within a reasonable time due to a condition not likely to change.

■ Having concluded that father is unfit under ORS 419B.504, we consider whether termination is in child's best interests, ORS 419B.500. Child has stability and a strong bond with his maternal grandmother, who wishes to adopt him, and his emotional health has improved under her care. She can provide him with the stable home that he needs now and that father will be unable to provide within a reasonable time. Termination of father's parental rights is in child's best interests.

Affirmed.

**BREWER, C. J.,** concurring.

I agree with and join in the majority opinion in this case. I write separately to emphasize my understanding of the role that the pleadings play in relation to the court's function in a proceeding for termination of parental rights based on a parent's alleged unfitness under ORS 419B.504.

A proceeding for termination of parental rights, unlike other civil actions, is initiated in a preexisting juvenile

court action where multiple underlying proceedings have already been held. However, like in other civil actions, the petition in a termination action is a formal pleading in the nature of a complaint that initiates a discrete legal proceeding. The petitioner is required to file an initiating petition for termination of parental rights that, consistently with ORCP 18 A, sets out one or more claims that contain "[a] plain and concise statement of the ultimate facts constituting a claim for relief without unnecessary repetition." What that typically means for purposes of a claim under ORS 419B.504, is that the petition will allege one or more grounds of unfitness under subsections (1) through (6) of the statute. The petition ordinarily will not include allegations under a subsection of the statute upon which the petitioner does not intend to rely. So, for example, it is often the case that the state will rely on one or more, but not all, of subsections (1) through (4) or (6) in alleging the particular conduct or condition of a parent that makes the parent unfit. The state also routinely relies on subsection (5) of the statute when it wishes to assert that the parent has failed to make a lasting adjustment so as to make it possible for the child to return to the parent's home. However, the petition need not rely on subsection (5) as a ground of unfitness.

The question arises, then, as to what role subsection (5) plays when a petition does not rely on that subsection as a ground of unfitness. Under the statute, a parent may place subsection (5) in play if the parent believes that the Department of Human Services has failed to make reasonable efforts to reunify the family. The preface to the statute requires the court to consider all pertinent subsections of the statute in determining whether, due to "conduct or conditions not likely to change," "integration of the child or ward into the home of the parent or parents is improbable within a reasonable time." It follows that, if a parent contends that integration of the child into the parent's home within a reasonable time is not improbable because a lasting adjustment could be effected by reasonable efforts that the Department of Human Services has so far failed to make, the court must consider that issue even if the state has not alleged a basis for termination under subsection (5).

By this I do not mean to suggest that the parent in such a circumstance bears the burden of proving a negative under subsection (5). It remains the state's obligation to plead and prove that integration is improbable in the terms of the statute. My point is a limited one: The parent may raise the issue of a lack of reasonable efforts in contesting the state's assertion of the improbability of integration into the parent's home within a reasonable time. As the majority correctly observes, when the issue is so joined, no single factor is controlling. In determining whether (1) a parent's conduct or condition has rendered the parent unfit in the statutory sense; and (2) integration within a reasonable time is improbable, the court must consider the totality of pertinent circumstances. In that regard, the grounds set out in subsections (1) through (6) are neither exclusive nor are they severally essential to a judgment of termination under ORS 419B.504. In my view, the majority has properly applied that understanding of the statute to affirm the judgment of termination in this case.

**WOLLHEIM, J.,** dissenting.

The Department of Human Services (DHS) sought to terminate father's parental rights under ORS 419B.502 and, alternatively, ORS 419B.504. DHS's allegation under ORS 419B.502 provides context in this case as, under that statute, DHS need not provide services aimed at reunifying the family where it can prove that the parent engaged in extreme conduct. Here, DHS concedes that it did not provide reasonable services to father in contravention of the legislative policy, ORS 419B.090(5), and the juvenile court's prior order in this case. Because father did not engage in extreme conduct as defined by ORS 419B.502, DHS did not prove that it provided father with reasonable services, which DHS acknowledges it did not provide despite the juvenile court's prior order, and reasonable services are a well-established element to unfitness under ORS 419B.504, I respectfully dissent.

## I.  THE FACTS

On *de novo* review, ORS 19.415(3)(a), the majority and I read the record differently on some points. In order to

frame my disagreement with the majority, I offer a description of the facts as I read the record.

In July 2006, father was arrested and charged with 26 counts of encouraging child sexual abuse. As a result of father's arrest, DHS filed a petition to establish jurisdiction over the child. At a July 2006 jurisdictional hearing, the juvenile court ordered father to obtain a psychosexual evaluation and participate in treatment. The court also ordered DHS to "make those referrals and offer those services reasonably necessary to achieve reunification."

Although the court ordered DHS to assist father in accessing treatment, DHS did not make any referrals or offer any services to father. Rather, father's attorney, not DHS, arranged for father to obtain a psychosexual evaluation. The evaluation was conducted by Nielsen, a clinical and forensic psychologist. Nielsen's report diagnosed father as having paraphilia not otherwise specified, which indicates that father has a pattern of sexually deviant interests.[1] Nielsen concluded that father "would probably not ever intentionally harm his son in any way" but "would be more of a risk [to other children] if he had exposure to unrelated children." Nielsen recommended that father "receive sexual offender treatment," because the "only way to alter or control his sexual addiction via the internet is through some type of monitoring that can be best found through typical sex offender treatment." Father then contacted some sexual offender treatment providers but could not afford to pay for treatment. Father requested referrals from DHS to sex offender treatment programs, making written requests in May and June 2007. There is no evidence in the record that DHS responded to those requests.

Before his criminal trial, father requested contact with child. DHS did not facilitate father's request until father obtained a court order in his criminal case that clarified that

---

[1] "The essential features of a Paraphilia are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors" including those involving "children or other nonconsenting persons that occur over a period of at least six months." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 566 (4th ed, text revision 2000) (*DSM-IV-TR*). Paraphilia not otherwise specified is a coding for paraphilias that do not meet the criteria for any specific category. *Id.* at 576.

father's pretrial release conditions on the pending criminal charges did not restrict him from supervised visits with child. DHS then authorized three supervised visits with child in July and August 2007. The DHS worker who supervised the contacts reported that father's conduct during the visits was "appropriate."

After the third visit, father was sentenced in August 2007, based on his guilty pleas, to eight counts of encouraging child sexual abuse in the first degree. On the first count, father received an 18-month term of incarceration to be followed by a 36-month period of post-prison supervision (PPS).[2] On the remaining seven counts, father was sentenced to probation for 60 months. His probationary terms restrict him from having any contact with children unless authorized by DHS. Father began serving his term of incarceration upon sentencing in August 2007, and DHS has not authorized father to have any contact with child since that time.

By July 2008, DHS had identified an adoptive resource—child's maternal grandmother—and petitioned for termination of father's parental rights. The petition followed an evaluation by child's therapist, Monahan, who reported that "[s]poradic contact with a parent is extremely stressful and confusing for any child but especially for a younger child such as [child]." Monahan added that sporadic contact is likely to be "detrimental to the parent-child relationship." Monahan thus recommended against allowing visits with father or mother. At the time of Monahan's recommendation, which occurred in March 2008, DHS had not allowed father to have contact with child for seven months.

In September 2008, father was released from prison. Father's probation conditions bar him from having any contact with any child unless DHS authorized that contact. Two weeks after father's release, father enrolled in a sex offender treatment program arranged through the county's probation

---

[2] The conditions of father's post-prison supervision (PPS) appear in the record through the testimony of Michael, father's probation officer. The record suggests that Michael supervises father for both the PPS conditions and probation conditions. Based on Michael's testimony, father's PPS conditions appear similar to his probation conditions.

office. That program was designed to last approximately 22 to 26 months.

In early 2009, approximately four months after father was released from prison, the juvenile court conducted a trial on the termination of father's parental rights.[3] DHS alleged that termination was proper because father had engaged in extreme conduct against a child, ORS 419B.502, and father was unfit under ORS 419B.504. Specifically, DHS alleged that father's extreme conduct under ORS 419B.502 was "sex abuse of a child by the parent."

DHS's allegation under ORS 419B.504 was less specific. DHS alleged: "father is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the father's home is improbable within a reasonable time due to conduct or conditions not likely to change"; and the petition further alleged that father failed to effect a lasting adjustment after "reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

Father testified at the termination trial. He presented his plan for reintegrating child into his home. At that time, father was living with his parents, planned to remain there for the foreseeable future, and had an extra bedroom in which child could stay. Father acknowledged that, as of the time of the termination trial, he was not "in a position * * * to independently care for" child, at least in part because he had not seen child since August 2007 and because, as he recognized, he did not have specific information regarding child's current special needs. Nonetheless, father asserted that he would be able to engage in a "gradual" transfer of custody from child's maternal grandmother that could be completed "within six months" and that he could then assume the role of stay-at-home parent.

Caywood, father's counselor in the sex offender program, testified that reintegration of minor children into the

---

[3] DHS also petitioned to terminate mother's parental rights, which the trial court did. Mother's parental rights are not an issue on appeal.

home of a sex offender is possible through a structured treatment program that begins with observed, supervised parent-child contacts. Those programs typically last between six and 18 months. Caywood noted that father has been "very cooperative" in treatment and has "completed the work in front of him." Caywood also testified that he supported allowing father to begin supervised visits with child in conjunction with that treatment program. Caywood testified that it would be "within the realm of possibilities [that father] could be around a child unsupervised" as soon as six months after supervised contact begins.

Moreover, Caywood distinguished different types of sex offenders between "having sort of hands on victims and the type of pornographic material [father] was viewing." That distinction is particularly relevant, according to Caywood, because father passed a polygraph examination indicating that "his interests had not translated into actual hands on behaviors." For that reason, Caywood acknowledged that the general course of treatment was between 22 and 26 months, but that father's treatment could be shorter. Caywood speculated that integration could take two years but also testified that father could have supervised contact with child starting in six months and that integration of child into father's home would start with supervised contact with father. On cross-examination, Caywood testified that father could integrate child with unsupervised contact within four to six months.

Caywood was less certain about the timeline for reintegration but Caywood was clear on one point: More information was needed before he could make a meaningful prediction as to father's progress through treatment—not to mention any time frame for integration. Caywood testified that he needed another, more current psychosexual evaluation of father to set forth a definitive program for father. Similarly, Caywood testified that father presented "a very low risk" to children in the present but admitted that he needed more data before he could make a long-term evaluation. Indeed, as he was pushed to predict timelines for father's progress through therapy, Caywood complained, "I see [father] once a week for an hour and a half or so, and I have access to the criminal records and his current active file with parole and probation. That's the extent of my, you know, the criteria

I have to make my assessment." Caywood's testimony is ultimately less than clear and convincing about a timeline for integration. Caywood gave three different estimates for the time it would take: four to six months; six months; or two years. But Caywood was certain about one point: He simply did not have enough data to make a prediction with which he was comfortable.

Father's probation officer, Michael, testified that father's conditions of supervision could be modified to allow father to have supervised visits with child. Michael would need to recommend to the judge in the criminal case that the conditions of supervision be modified. Michael indicated that she would follow Caywood's recommendation whether to allow visits so long as father was compliant with all the other conditions of probation and father continued to pass all polygraph examinations.[4] The record indicates that father has passed all of his polygraph examinations. Michael testified that the probation conditions for other sex offenders whom she had supervised had been modified to allow unsupervised contact with their children when they had neared the completion of sex offender treatment. Thus, Michael's testimony establishes that father's probation conditions can be modified and that similar modifications have occurred toward the end of sex offender treatment. But as to the time frame for father's treatment—which Michael testified determines the time frame for father's ability to have contact with child—she deferred to Caywood's judgment.

## II. THE JUVENILE COURT'S JUDGMENT

As previously mentioned, the court's findings must be established by clear and convincing evidence. ORS 419B.521(1). Evidence is clear and convincing if it makes the existence of a fact "highly probable" or if it is of "extraordinary persuasiveness." *State ex rel Dept. Human Services v. A. M. P.*, 212 Or App 94, 104, 157 P3d 283 (2007).

The issue is whether those facts support termination of father's parental rights. ORS 419B.502 and ORS 419B.504

---

[4] However, father had violated a term of his probation that prohibited all contact with mother. Michael indicated that the sanction for that violation would be that father would lose his computer privileges.

provide separate bases for terminating a parent's right to raise her or his child. ORS 419B.500 provides that parental rights may be terminated as provided under ORS 419B.502 to 419B.524 if termination is "in the best interest of the ward." If a parent is unfit under either ORS 419B.502 or ORS 419B.504 and termination serves the best interest of the child under ORS 419B.500, then the judgment must be affirmed. *See State ex rel Dept. of Human Services v. Radiske*, 208 Or App 25, 61, 144 P3d 943 (2006) (a termination judgment will be affirmed if it serves the child's best interest and the juvenile court correctly found the statutory ground for termination).

The juvenile court terminated father's parental rights on the basis of extreme conduct, ORS 419B.502, and unfitness, ORS 419B.504. Because this case cannot be fully understood without an examination of DHS's allegations under ORS 419B.502, and because I would reverse, I discuss both of the court's bases for terminating father's parental rights.

### III.   EXTREME CONDUCT, ORS 419B.502

DHS's allegation of extreme conduct provides the context for the issues that arise in this case. The general legislative policy is to encourage reunification of the family by providing reasonable services, unless the case involves extreme conduct by the parent. ORS 419B.090(5) provides:

> "It is the policy of the State of Oregon, *in those cases not described as extreme conduct* under ORS 419B.502, to offer appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time."

(Emphasis added.) Here, DHS alleged that father engaged in extreme conduct.

DHS's allegation of extreme conduct provides a possible explanation as to why DHS did not seek reunification of the family in this case. DHS refused to allow father to have conduct with child prior to father's convictions, and even after the court clarified that father was permitted to have supervised contact with child, DHS authorized only sporadic

contact with father. DHS's theory that father had engaged in extreme conduct also provides context for DHS's decision not to provide father with services even after the court ordered DHS to provide father with services. By refusing to allow father judicially authorized contact with child and ignoring an order to provide father with reasonable services, DHS created some of the very conditions that it now contends justify terminating father's parental rights under ORS 419B.504. I first discuss why ORS 419B.502 does not apply to father's actions and then discuss why DHS failed to establish, by clear and convincing evidence, that father's parental rights should be terminated under ORS 419B.504.

A court may terminate a parent's rights under ORS 419B.502:

> "if the court finds that the parent * * * [is] unfit by reason of a single or recurrent incident of extreme conduct toward any child. In such a case, no efforts need to be made by available social agencies to help the parent adjust the conduct in order to make it possible for the child or ward to safely return home within a reasonable amount of time. In determining extreme conduct, the court shall consider the following:
>
> "(1)   Rape, sodomy or sex abuse of any child by the parent."

The focus of the inquiry under ORS 419B.502 is on the egregiousness of past conduct, not on whether the conduct has a detrimental effect on the child in the present. In addition, in extreme conduct cases, ORS 419B.502 provides that "no efforts need to be made by available social agencies to help the parent adjust the conduct in order to make it possible for the child or ward to safely return home."

In this case, DHS alleged that "father is unfit * * * by reason of the following extreme conduct toward a child: * * * Sex abuse of a child by the parent." The juvenile court found that the allegation was supported by clear and convincing evidence. The issue, therefore, is whether the phrase "sex abuse" in ORS 419B.502(1) encompasses father's conduct of downloading and viewing child pornography.

The statute defines extreme conduct to include "sex abuse of any child *by* the parent." ORS 419B.502(1) (emphasis added). The use of the word "by" conveys the legislature's intent that ORS 419B.502(1) applies only when a parent himself or herself engages in sexual abuse of any child. Statutory context confirms that interpretation. The criminal code defines crimes of "sexual abuse" as requiring that the crime be committed by the offender, himself or herself: a person commits the crime of sexual abuse only if the person "subjects another person" to some form of sexual contact. ORS 163.415(1)(a) (third-degree sexual abuse); ORS 163.425(1)(a) (second-degree sexual abuse); ORS 163.427(1)(a) (first-degree sexual abuse). Consequently, I conclude that ORS 419B.502(1) applies only when a parent himself or herself subjects any child to some form of sexual contact.

Although father was convicted of serious offenses, eight counts of encouraging child sexual abuse in the first degree, ORS 163.684, father was not convicted of sexually abusing any child himself. By duplicating or printing a visual image of child pornography on his computer, father did not himself subject any child to sexual contact. On the record in this case, father neither personally participated in sexually abusing any child nor did he direct anyone else to sexually abuse any child. There is no evidence, let alone clear and convincing evidence, that father himself committed "rape, sodomy or sex abuse of any child" under ORS 419B.502(1). Therefore, the trial court erred in terminating father's parental rights under ORS 419B.502. Next, I consider whether the trial court erred under ORS 419B.504.

## IV. UNFITNESS, ORS 419B.504

Father's conduct was deplorable. My dissent is not based on a conclusion that father's conduct was acceptable. If the record established that DHS proved, by clear and convincing evidence, that it provided reasonable services or that DHS was relieved of its duty to provide any services, then I would agree with the majority and affirm the trial court's judgment terminating father's parental rights. But DHS did not meet its burden of proof. I now turn to the statutory requirement of reasonable services.

## A. *DHS Must Prove Reasonable Services*

ORS 419B.504 provides that the court may find that the parent is

> "unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward in to the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
>
> "* * * * *
>
> "(5)  Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

The parent's fitness "must be measured *at the time of the parental rights termination trial.*" *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006) (emphasis in original). The analysis focuses on the detrimental effect that a parent's conduct or condition has on the child and not on the egregiousness of that conduct in the abstract. *State ex rel SOSCF v. Stillman*, 333 Or 135, 146, 36 P3d 490 (2001). In addition, ORS 419B.504 "requires clear and convincing evidence that '[DHS made] reasonable efforts to assist parents in making the adjustments to enable them to become minimally adequate parents.'" *State ex rel Dept. of Human Services v. R. O. W.*, 215 Or App 83, 99, 168 P3d 322 (2007) (quoting *State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272, *rev den*, 327 Or 305 (1998)) (brackets in *R. O. W.*). As previously mentioned, evidence is clear and convincing where the evidence makes the asserted fact "highly probable" or the evidence is of "extraordinary persuasiveness." *A. M. P.*, 212 Or App at 104.

On appeal, DHS essentially concedes that it did not make reasonable efforts. In its petition, DHS alleged that father failed to "effect a lasting adjustment after reasonable

efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." The trial court expressly concluded that DHS proved some allegations by clear and convincing evidence but the trial court did not conclude that father failed to make a lasting adjustment after reasonable efforts were made. Thus, the trial court found that DHS did not prove that allegation by clear and convincing evidence. Moreover, DHS noted on appeal that it does not "renew the five grounds which the juvenile court found unproved."

DHS's concession is well taken. The evidence shows that DHS never provided father any assistance in maintaining contact with child. Although Monahan observed that "[s]poradic" parental contact was likely to be "extremely stressful and confusing for any child" and "detrimental to the parent-child relationship," DHS limited father to sporadic contact by allowing only three supervised visits over two and one-half years. Those three visits resulted from father's own active efforts. Father's conduct in those visits was "appropriate." DHS then prohibited father from maintaining contact with child while father was incarcerated in August 2007. Nothing in the record establishes that father's incarceration physically prohibited visitation.

The record does not establish, by clear and convincing evidence, that any improbability that father can reintegrate child into his home within a reasonable time from child's perspective was due to father's conditions or conduct. To the contrary, DHS's conduct in severely restricting father's visits with child to an extremely "sporadic" frequency appears to have had a negative impact.

Nonetheless, DHS argues that it does not have to prove that it provided reasonable services. DHS is wrong. ORS 419B.504 requires DHS to prove, by clear and convincing evidence that the improbability that the child may be reintegrated into the home is "due to conduct or conditions not likely to change." DHS can only prove that fact by showing that services have failed or will fail.

Statutory context confirms that interpretation. As a general rule, DHS must provide parents with reasonable services. "[I]n those cases not described as extreme conduct,"

the legislatively enacted policy is "to offer appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time." ORS 419B.090(5). Thus, the legislature has expressly highlighted the difference between terminations under ORS 419B.502 that involve extreme conduct and terminations under ORS 419B.504 that do not involve extreme conduct. In cases involving extreme conduct, DHS need not provide reasonable services, ORS 419B.090(5), nor must DHS prove that it did so to terminate parental rights, ORS 419B.502 ("In such a case [involving extreme conduct], no efforts need to be made by available social agencies * * *."). But in cases not involving extreme conduct, the general rule—DHS must provide and prove reasonable services—persists.[5] And, at a termination trial, DHS must prove that integration is improbable due to the parent's conduct or condition that is not likely to change within a reasonable time. ORS 419B.504. Furthermore, the court must scrutinize whether the parent put forth inadequate efforts despite the reasonable services made available by DHS. *See* ORS 419B.504(5) (requiring the court to consider the "failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected").

Case law confirms that interpretation. For example, in *R. O. W.*, we first stated what DHS must prove, including reasonable services, and second, analyzed whether DHS proved the necessary elements. 215 Or App at 99 (setting forth elements DHS must prove in a termination hearing, including reasonable efforts); *Id.* at 104-05 (stating that "[w]e next consider whether DHS made reasonable efforts to assist [the] parents" and later concluding that "DHS's efforts in assisting mother to become a minimally adequate parent were reasonable"). In *R. O. W.* we concluded that, whenever

---

[5] The majority relies on contextual references to infer a policy that DHS need not prove that it provided reasonable services under ORS 419B.504. That inference from legislative silence is particularly weak in light of the legislature's expressed policy of providing reasonable services in all cases except those involving extreme conduct.

DHS proves that reasonable efforts were provided but were unsuccessful, we will affirm the trial court's decision terminating parental rights. *Id.*

Whether DHS's efforts were reasonable depends on the particular circumstances of each case. *Id.* at 99. If services would not assist the parent in reintegrating the child into the home, it is reasonable for DHS to decline to provide services. *Id.* at 105; *see also* ORS 419B.340(4) (if "further preventive or reunification efforts could not permit the ward to remain without jeopardy at home, the court may authorize or continue the removal of the ward"); *State ex rel SOSCF v. Farish*, 182 Or App 322, 336, 49 P3d 811, *rev den*, 334 Or 693 (2002) (DHS's choice to provide some services but not others may be reasonable under the circumstances); *Frazier*, 152 Or App at 602 (DHS relieved of any duty to provide therapy where parent never requested services and did not take advantage of other opportunities).

However, DHS is obligated to provide services, which, if successful, would allow a parent to reintegrate a child into the home within a reasonable time. Accordingly, "[i]f sex offender treatment is a requirement for family reunification, then it follows that a realistic reunification plan *must* provide an opportunity for the parent to complete the required treatment successfully." *State ex rel SOSCF v. Burke*, 164 Or App 178, 191, 990 P2d 922 (1999), *rev den*, 330 Or 138 (2000) (emphasis added). Alternatively, DHS can satisfy its burden of proving reasonable services by showing that it is reasonable to provide no services. *See R. O. W.*, 215 Or App at 105 (DHS proved reasonable services where it established that further services would be futile). Again, on this record, DHS simply failed to prove that it either provided reasonable services or it was reasonable not to provide any services. Thus, the majority misses the point when it concludes that reasonable services must be proved in some but not all cases. I agree with the majority's statement as an abstract proposition of law. But DHS must prove what is reasonable based on the record in this case. Here, because DHS concedes that it did not provide reasonable services, I would reverse the trial court's termination of father's parental rights.

Because DHS failed to prove that father is unfit under ORS 419B.504, there is no need to consider whether termination is in child's best interests. In other words, the state may not terminate a parent's parental rights where the state has not established that the parent is unfit. The Supreme Court has stated, albeit in a slightly different context, that "perfection in parenting is neither attainable nor required." *Simmons*, 342 Or at 103; *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 87, 106 P3d 627 (2005). The legislature has taken the same tact in requiring proof by clear and convincing evidence that a parent is unfit before authorizing termination of parental rights, *see, e.g.*, ORS 419B.502 (stating standard); ORS 419B.504 (same), along with the duty imposed on DHS to provide reasonable services before terminating parental rights under ORS 419B.504. That is consistent with the liberty interest at stake in any case involving the termination of parental rights, which is "perhaps the oldest of the fundamental liberty interests recognized by" the United States Supreme Court. *Troxel v. Granville*, 530 US 57, 65, 120 S Ct 2054, 147 L Ed 2d 49 (2000); *see also id.* at 68 ("[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family.").

B. *DHS Failed to Adduce Clear and Convincing Evidence that Integration is Unlikely Within a Reasonable Time.*

Finally, I would reverse even under the majority's analysis because the majority incorrectly relieves DHS of its burden of proof. DHS must prove that father is unfit because of conduct or a condition that is seriously detrimental to child and that child's integration into father's home is improbable within a reasonable time due to conditions not likely to change. As to father's unfitness, the majority concludes that father is unfit because he is subject to a PPS condition that he have no contact with minors, including child. At the outset, it is noteworthy that father's condition of PPS can be changed if father establishes that he can safely have contact with child. It is also worth noting that DHS failed to comply with the court order to provide father with any services, contrary to the policy of the State of Oregon. Setting aside DHS's failure

to provide any services to father, there are flaws in the majority's two reasons for concluding that father's condition is seriously detrimental to child.

First, the majority reasons that "[f]ather's condition, in conjunction with his earlier incarceration, has prevented and will continue to prevent him from providing a stable home to child." 239 Or App at 138. That is confusing because the majority emphasizes that we examine father's conduct "at the time of the termination hearing" and that we do not look at past events to determine whether termination is proper. 239 Or App at 140. But, if we were to look at father's condition in the context of past events, the majority seems to suggest that father's seriously detrimental condition is not simply the condition of PPS that father have no contact with minors; rather, the majority appears to be suggesting that other concerns about father would justify terminating his parental rights. Without any doubt, father's paraphilia is a very serious and concerning condition. However, DHS adduced evidence that father was experiencing success in treatment, and experts predicted that father posed little to no risk to child, and, further, that father could safely have contact with child within four to six months.

The majority does not address the difficult issue in this case. Father engaged in conduct that, while egregious, does not rise to the level of extreme conduct as defined by ORS 419B.502. It is the policy of the State of Oregon to seek reunification of families whenever possible in cases, such as this, that do not involve extreme conduct. The majority would affirm the termination of father's parental rights because he is subject to a condition of probation that is within the control of DHS; father may have contact with child if DHS authorizes that contact. DHS has a duty to seek reunification of the family. This record does not establish by clear and convincing evidence that father cannot integrate child within a reasonable time. The record establishes that integration is possible within four to six months. The majority says that child cannot wait two years. The record does not establish that two years are required before integration is possible.

Second, the majority contends that "[f]ather's condition leaves child without the stable home that child needs

and thus is seriously detrimental to child." 239 Or App at 138. But as the majority reports: "child is bonded to his maternal grandmother, who is his current placement and wishes to adopt him, and she is able to meet his significant needs." 239 Or App at 135. Thus, child is currently in a stable home. Moreover, father has proposed a reintegration plan that is consistent with child's needs. Caywood testified that reintegration of child would require a methodical process that can start as soon as six months into treatment, and father has proposed such a reintegration plan. Although there is no question that child faces substantial difficulties, DHS has failed to adduce clear and convincing evidence that father's condition—a condition of probation restricting contact with minors—is seriously detrimental to child.

As to whether child's integration into father's home is improbable within a reasonable time due to conditions not likely to change, the majority relies on two facts: (1) child cannot wait two years for father's probation conditions to change and (2) "[f]ather will likely need two years before he could obtain approval from his parole officer to integrate child into his home." 239 Or App at 139. In concluding that father will need two years to obtain approval from his parole officer to integrate child into his home, the majority incorrectly relieves DHS of its burden of proof.

The majority contends that Caywood's testimony establishes that father cannot integrate child within two years, so termination is proper. However, Caywood also recommended that father integrate child within six months at one point and four months at another point in the record. Moreover, as he was pressed to predict time frames for father's treatment, Caywood repeatedly testified that he did not have enough information to make such predictions because he sees father "once a week for an hour and a half or so, and I have access to the criminal records and his current active file with parole and probation. That's the extent of my, you know, the criteria I have to make my assessment."

As to father's progress through treatment generally, Caywood testified that, before he could make an evaluation he was comfortable with, he needed more information. Given that Caywood twice testified that father could integrate child

within six months but also predicted that father may integrate child within two years at another point and that Caywood consistently warned that he did not have adequate information to make predictions about father's progress, Caywood's testimony does not establish clear and convincing evidence that father will not be able to integrate child within a reasonable time.[6] The majority does not identify other evidence as to the time when father will be able to reintegrate child, and I am not aware of any. Accordingly, DHS has not proved by clear and convincing evidence that child's integration into father's home is improbable within a reasonable time due to conditions not likely to change.

DHS did not provide father with reasonable services. DHS continued to ignore that statutory requirement even after the court ordered DHS to provide reasonable services. Nonetheless, DHS would terminate father's parental rights because it incorrectly decided that reasonable services are not necessary.

I respectfully dissent.

Carson, S. J., joins in this dissent.

**SERCOMBE, J.,** dissenting.

I agree with the dissent that the state failed to make its case that integration of child into father's home was

---

[6] The majority also relies on Michael's testimony that father can integrate child as father progresses through sex offender treatment. Michael also made a prediction about father's time frame for making that progress. However, Michael's testimony was based on general observations about sex offender treatment, not specific to father, that is the sort of testimony the majority otherwise rejects, *see* 239 Or App at 132 n 2 (rejecting generalized testimony about progress through treatment).

As to any predictions specifically about father, Michael testified that she would rely on Caywood's recommendations. Moreover, the majority omits Michael's testimony that "I'm sorry to say that I can't give an exact time frame of when [contact between father and child] would be allowed"; that, "if Mr. Caywood said in six months, 'I would have no concerns from a treatment position about [father] having contact with children unsupervised'"; and that Michael would likely adopt that position if father were complying with his other probation conditions. Thus, Michael's testimony does not establish that father could not have contact with child until he finishes treatment and Michael's testimony did not elevate Caywood's equivocal evidence as to the time frame for when integration can begin to clear and convincing evidence.

"improbable within a reasonable time due to conduct or conditions not likely to change" under ORS 419B.504. The state did not clearly prove that father's condition, a paraphilia mental disorder, could not be treated so as to remedy any risk to child within a period of time that is reasonable to allow for family reunification. There was evidence in the record that that treatment outcome was possible within six months and that beginning integration at that time would not be more injurious to child than an earlier start. Nor did the state prove that father's post-prison supervision conditions would preclude timely reunification efforts. In my view, the state did not present sufficient evidence to show satisfaction of the standards in ORS 419B.504 by clear and convincing proof.

I agree with the majority, however, that a finding of past reasonable efforts is not necessary in every ORS 419B.504 case. A failure to provide reasonable services might make it more difficult for the state to prove that the parent's "conduct or conditions [are] not likely to change" under ORS 419B.504. But such a failure should not categorically prevent termination of parental rights under the statute as suggested by Judge Wollheim in his dissent. Had the state clearly proved that father's condition created a risk to child that would not change without two years of treatment, and that that period of time was unreasonable for integration, then father's rights could have been terminated notwithstanding a failure to provide services much earlier in the dependency process. But the state did not prove this by clear and convincing evidence. Instead, the evidence was equivocal and largely presented through the supportive testimony of father's own therapist. That inferiority of proof precludes termination.